# 25-2825

## IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

PASTOR ADEN RUSFELDT,

*Plaintiff-Appellant*,

*v.*

CITY OF NEW YORK, NEW YORK and POLICE LIEUTENANT STEPHEN HUGHES,

*Defendants-Appellees*,

and

COMMISSIONER EDWARD A. CABAN, DERMONT SHEA, in his Official Capacity as Commissioner of the City of New York Police Department, KEECHANT SEWELL, in her Official Capacity as Commissioner of the City of New York Police Department, STEPHEN SPATARO, in his Official Capacity as Captain of the City of New York Police Department, and OFFICERS JOHN DOE 1−10, in their Official Capacities as officers of the City of New York Police Department,

*Defendants.*

Appeal from the Judgment of the United States District Court for the Southern District of New York

### APPELLANT'S PAGE PROOF BRIEF & SPECIAL APPENDIX

Josh Dixon
Center for American Liberty
2145 14th Avenue, Suite 8
Vero Beach, FL 32960
(703) 687-6212
jdixon@libertycenter.org
*Counsel for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Appellant is an individual.

# TABLE OF CONTENTS

INTRODUCTION..................................................................................1

STATEMENT OF JURISDICTION .....................................................3

STATEMENT OF THE ISSUES ..........................................................5

STATEMENT OF THE CASE ..............................................................5

   I.   FACTUAL BACKGROUND ........................................................6

      A.   Rusfeldt..................................................................................7

      B.   NYC Pride..............................................................................7

      C.   Rusfeldt goes to the Park to Proselytize .............................8

      D.   Rusfeldt's Sign and the Crowd's Hostile Reaction to it ...................10

      E.   The NYPD Orders Rusfeldt to Disperse...........................11

      F.   The NYPD Arrests Rusfeldt ...............................................14

   II.  PROCEDURAL HISTORY .......................................................15

      A.   Pretrial.................................................................................15

      B.   Trial......................................................................................16

      C.   Post-trial ..............................................................................17

SUMMARY OF THE ARGUMENT ....................................................19

STANDARD OF REVIEW ..................................................................23

ARGUMENT ........................................................................................23

   I.   THIS APPEAL TURNS ON QUESTIONS OF
       CONSTITUTIONAL LAW, NOT DISPUTED FACTS ............24

      A.   Rusfeldt raises questions of law.........................................24

      B.   The constitutional fact doctrine applies. ............................25

II. THE DISTRICT COURT ERRONEOUSLY CONCLUDED THAT THERE WAS "NO SUCH THING AS THE HECKLER'S VETO DOCTRINE" .........................................................26

   A.    Regulating a speaker due to listeners' reaction to his speech constitutes viewpoint discrimination as a matter of law, triggering strict scrutiny. ..........................................26

   B.    The heckler's veto doctrine applies even if the police are subjectively motivated solely by the intent to promote public order. ...............................................................30

       1.   The district court's rule is foreclosed by *Forsyth County*. ...............................................................30

       2.   The district court misinterpreted *Kass*. ...........................34

III. AS A MATTER OF LAW, THE HECKLER'S VETO DOCTRINE APPLIES HERE AND THE NYPD DID NOT SATISFY STRICT SCRUTINY .................................37

   A.    The NYPD ordered Rusfeldt to disperse "due to" the crowd's reaction to his speech. ....................................38

   B.    The NYPD failed to satisfy strict scrutiny…………….…………39

       1.   The NYPD did not demonstrate that its interest in maintaining public order was compelling on the facts here. ...............................................................40

       2.   The NYPD did not demonstrate that its actions were necessary or that it took the least speech-restrictive means available to it. ...........................................42

IV. RUSFELDT IS ENTITLED TO JUDGMENT ON ALL HIS CLAIMS .....................................................................44

   A.    First Amendment..............................................................44

   B.    Fourth Amendment ..........................................................46

   C.    Free exercise ....................................................................48

V. *NIEVES* DOES NOT UNDERMINE RUSFELDT'S ENTITLEMENT TO JUDGMENT ON HIS FIRST AMENDMENT CLAIM....................................................49

A.   *Nieves* does not apply to heckler's veto claims. ...............................49

B.   Even if *Nieves* applied to heckler's veto claims, Rusfeldt has established the *Nieves* exception. .................................52

VI. DISTRICT COURT ERRED BY FAILING TO GRANT RUSFELDT A NEW TRIAL ...............................................53

A.   The charge erroneously failed to instruct the jury on the heckler's veto doctrine. ........................................................54

B.   The charge incorrectly stated that Rusfeldt was required to prove that NYPD officers had a retaliatory animus against him. ....................................................................................55

C.   The charge incorrectly stated that Rusfeldt was required to prove the absence of probable cause or that the *Nieves* exception applied. .............................................................56

D.   The charge incorrectly limited Rusfeldt's First Amendment claim to his arrest. .........................................56

CONCLUSION ...............................................................................57

CERTIFICATE OF COMPLIANCE ......................................................58

SPECIAL APPENDIX .......................................................................59

# TABLE OF AUTHORITIES

**Cases**

*A.H. v. French*,
   985 F.3d 165 (2d Cir. 2021) ............................................................27

*Abernathy v. Conroy*,
   429 F.2d 1170 (4th Cir. 1970) ........................................................40

*Akinnagbe v. N.Y.C.*,
   128 F. Supp. 3d 539 (E.D.N.Y. 2015) ...........................................43

*Am. Trucking Ass'n v. N.Y. Thruway Auth.*,
   795 F.3d 351 (2d Cir. 2015) ...........................................................24

*Ashley v. N.Y.C.*,
   992 F.3d 128 (2d Cir. 2021) ...........................................................64

*Bachellar v. Maryland*,
   397 U.S. 564 (1970) ........................................................................36

*Ballentine v. Tucker*,
   28 F.4th 54 (9th Cir. 2022) ......................................................62, 63

*Bashir v. Rockdale County*,
   445 F.3d 1323 (11th Cir. 2006) ......................................................54

*Bible Believers v. Wayne Cnty.*,
   805 F.3d 228 (6th Cir. 2015) ................. 31-34, 36, 38, 39, 45, 49, 51-53, 57, 58

*Bogle–Assegai v. Connecticut*,
   470 F.3d 498 (2d Cir. 2006) ...........................................................45

*Brown v. Ent. Merchants Ass'n*,
   564 U.S. 786 (2011) ..................................................................48, 49

*Cantwell v. Connecticut*,
   310 U.S. 296 (1940) ........................................................................57

*Case v. N.Y.C.*,
   233 F. Supp. 3d 372 (S.D.N.Y. 2017) ...........................................61

*Chaplinsky v. New Hampshire*,
   315 U.S. 568 (1942) ........................................................................39

*Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*,
   972 F.2d 365 (D.C. Cir. 1992) ...........................................32, 33, 38

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ....................................................................57

*Collins v. N.Y.C.*,
295 F. Supp. 3d 350 (S.D.N.Y. 2018) ....................................43

*Cornelius vs. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1995) ................................................................29

*Counterman v. Colorado*,
600 U.S. 66 (2023) ..................................................................40

*Cox v. Louisiana*,
379 U.S. 536 (1965) ..........................................................36, 43

*Ctr. for Bio-Ethical Reform, Inc., v. L.A. Cnty. Sheriff's Dep't*,
533 F.3d 780 (9th Cir. 2008) ............................................32, 37

*Curry v. City of Syracuse*,
316 F.3d 324 (2d Cir. 2003) ....................................................55

*Deferio v. City of Syracuse*,
306 F. Supp. 3d 492 (N.D.N.Y. 2018) ..............................38, 53

*Dickerson v. Napolitano*,
604 F.3d 732 (2d Cir. 2010) ....................................................55

*Dupree v. Younger*,
598 U.S. 729 (2023) ..........................................................26, 27

*Edwards v. South Carolina*,
372 U.S. 229 (1963) ................................................................37

*Fabrikant v. French*,
691 F.3d 193 (2d Cir. 2012) ....................................................60

*Feiner v. New York*,
340 U.S. 315 (1951) ................................................................39

*Forsyth Cnty. v. Nat'list Movement*,
505 U.S. 123 (1992) ....................................................30, 35, 36

*Friend v. Gasparino*,
61 F.4th 77 (2d Cir. 2023) ......................................29, 33, 56, 61

*Gonzalez v. Trevino*,
602 U.S. 653 (2024) ................................................................62

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021) ....................................................................26

*Gregory v. City of Chicago*,
   394 U.S. 111 (1969) ..................................................................36

*Hous. Works, Inc. v. Kerik*,
   283 F.3d 471 (2d Cir. 2002) ....................................................36

*Jones v. Parmley*,
   465 F.3d 46 (2d Cir. 2006) ................................................43, 48

*Kass v. City of New York*,
   864 F.3d 200 (2d Cir. 2017) .......................................19, 41, 42

*Keeling v. Hars*,
   809 F.3d 43 (2d Cir. 2015) ......................................................24

*Leroy v. Livingston Manor Cent. Sch. Dist.*,
   158 F.4th 414 (2d Cir. 2025) ..................................................31

*Lozman v. Riviera Beach*,
   585 U.S. 87 (2018) .............................................................59, 60

*Masterpiece Cakeshop v. Colo. C.R. Comm'n*,
   584 U.S. 617 (2018) ................................................................58

*Matal v. Tam*,
   137 S. Ct. 1744 (2017) ...........................................................32

*McCullen v. Coakley*,
   573 U.S. 464 (2014) ..........................................................30, 40

*Meinecke v. City of Seattle*,
   99 F.4th 514 (9th Cir. 2024).............29, 31, 33, 34, 37, 49, 51, 53

*Melzer v. Bd. of Educ. of City Sch. Dist. of N.Y.C.*,
   336 F.3d 185 (2d Cir. 2003) ....................................................33

*Meyers v. City of New York*,
   812 F. App'x 11 (2d Cir. Apr. 30, 2020) ................................44

*Miller v. Fenton*,
   474 U.S. 104 (1985)..........................................................25, 28

*Monell v. Department of Social Services*,
   436 U.S. 658 (1978) ................................................................16

*Myers v. Richland Cnty.*,
   429 F.3d 740 (8th Cir. 2005) ..................................................66

*Nieves v. Bartlett*,
   587 U.S. 391 (2019)...................................................19, 59, 60, 61

*People v. Todaro*,
  26 N.Y.2d 325 (1970)................................................................41

*Plagianos v. Am. Airlines, Inc.*,
  912 F.2d 57 (2d Cir. 1990)........................................................64

*Posr v. Ct. Officer Shield No. 207*,
  180 F.3d 409 (2d Cir. 1999)......................................................56

*Posr v. Doherty*,
  944 F.2d 91 (2d Cir. 1991)........................................................55

*Provost v. City of Newburgh*,
  262 F.3d 146 (2d Cir. 2001)......................................................56

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015).................................................30, 36, 37

*Rusfeldt v. N.Y.C.*,
  No. 22-CV-594 (PKC),
  2024 WL 4354874 (S.D.N.Y. Sep. 30, 2024) ............................6

*Rusfeldt v. N.Y.C.*,
  No. 22-CV-594 (PKC),
  2025 WL 2808822 (S.D.N.Y. Oct. 2, 2025)................................6

*SEC v. Ginder*,
  752 F.3d 569 (2d Cir. 2014)......................................................24

*Snyder v. Phelps*,
  562 U.S. 443 (2011).............................................................27, 28

*Song v. Ives Lab'ys*,
  957 F.2d 1041 (2d Cir. 1992)....................................................24

*Terminiello v. City of Chicago*,
  337 U.S. 1 (1949)................................................................37, 39

*United States v. Age*,
  136 F.4th 193 (5th Cir. 2025)....................................................66

*United States v. Friday*,
  525 F.3d 938 (10th Cir. 2008)...................................................26

*United States v. Playboy Ent. Grp., Inc.*,
  529 U.S. 803 (1992)...................................33, 34, 47, 50

*Walczyk v. Rio*,
  496 F.3d 139 (2d Cir. 2007)......................................................26

*Walker v. Schult*,
   45 F.4th 598 (2d Cir. 2022) ...............................................................26

*Wandering Dago, Inc. v. Destito*,
   879 F.3d 20 (2d Cir. 2018) .................................................................31

*Westchester Day Sch. v. Vill. of Mamaroneck*,
   386 F.3d 183 (2d Cir. 2004) ...............................................................47

*Worrell Newspapers of Ind., Inc. v. Westhafer*,
   739 F.2d 1219 (7th Cir. 1984) ............................................................50

*Wright v. Georgia*,
   373 U.S. 284 (1963) ...........................................................................56

*Zieper v. Metzinger*,
   474 F.3d 60 (2d Cir. 2007) .................................................................53

**Statutes**

NYPL § 240.20(6) ...................................................................................14

**Other Authorities**

MERRIAM-WEBSTER ONLINE DICTIONARY .............................................55

BLACK'S LAW DICTIONARY (12th ed. 2024) ...........................................55

**INTRODUCTION**

This case presents a pure legal question under the First Amendment: may the police regulate a peaceful speaker because listeners threaten or engage in violence against him due to his speech? For decades, the Supreme Court has said "no"—there is no heckler's veto. Under the heckler's veto doctrine, regulating a speaker due to listeners' reaction to his speech ratifies their viewpoint discrimination against him as a matter of law, triggering strict scrutiny.

This is a textbook heckler's veto case. The incident in question was captured on video, and there are no material factual disputes. Pastor Aden Rusfeldt was standing on a sidewalk in lower Manhattan holding a sign that criticized LGBTQ+ conduct. A crowd gathered and began heckling him. When individuals in the crowd started throwing bottles at him, NYPD officers on the scene intervened. But rather than direct their law-enforcement efforts against the crowd, the officers directed those efforts against Rusfeldt, ordering him to leave the area due to the crowd's acts. Rusfeldt politely declined, invoking his First Amendment rights, and the officers arrested him for failing to comply.

Rusfeldt does not contend that the officers personally disapproved of his message. But the crowd did, and because the officers ordered him to disperse due to the crowd's reaction to his speech, the officers ratified the crowd's viewpoint discrimination against him as a matter of law.

1

The district court rejected this conclusion, announcing that "there is no such thing as the [h]eckler's veto doctrine." According to the district court, the police do not engage in viewpoint discrimination when they order a speaker to disperse due to listeners' reaction to his speech if officers have the subjective intent to promote public order. In the district court's view, the police only engage in viewpoint discrimination when they have the subjective intent to suppress or discriminate against the speaker's viewpoint.

That rule is foreclosed by Supreme Court precedent. In *Forsyth County v. Nationalist Movement*, the Supreme Court held that listeners' reaction to speech is not a content-neutral basis for regulation. The Court rejected the government's argument that regulating a speaker due to listeners' reaction is content neutral so long as the government has the subjective intent to maintain public order. Under *Forsyth County*, the police engage in viewpoint discrimination as a matter of law when they order a speaker to disperse due to listeners' reaction to his speech, regardless of officers' subjective motivations.

Because the district court rejected the heckler's veto doctrine, it never evaluated either whether the doctrine applies here or whether the NYPD satisfied strict scrutiny. And the NYPD did not address these questions below, so it has waived argument about them.

Even if the NYPD had preserved the arguments, they would fail. Officers indisputably ordered Rusfeldt to disperse due to the crowd's reaction to his speech. Under the heckler's veto doctrine, the NYPD thus engaged in viewpoint discrimination against Rusfeldt as a matter of law.

Strict scrutiny applies, and the NYPD cannot satisfy it. The NYPD could have neutralized the threat to public safety the crowd posed in other ways, like setting up additional barricades, stationing additional officers on the scene, issuing warnings to the crowd not to break the law, or ordering the crowd to disperse. And even if the crowd had been beyond the NYPD's control, the NYPD had ample resources to disperse the entire scene. Instead, the NYPD chose the option that was most restrictive of Rusfeldt's speech: ordering him—and only him—to disperse and arresting him for failing to comply. The First Amendment forbids that choice.

This case never should have gone to trial, and the district court should have granted Rusfeldt's motion for judgment as a matter of law. Because the judgment for the NYPD rests on a fundamental misinterpretation of the heckler's veto doctrine, the Court should REVERSE and REMAND for further proceedings.

## <u>STATEMENT OF JURISDICTION</u>

This is a § 1983 action against the City of New York, the entity that operates the NYPD (the "NYPD"). As relevant, Rusfeldt alleges that the NYPD violated his rights under: (1) the Speech Clause (the "First Amendment" claim); (2) the Fourth

Amendment; and (3) the Free Exercise Clause. Dkt. 1, 83. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(3).[1]

On September 30, 2024, the district court denied Rusfeldt's Rule 56 motion for summary judgment in full and granted the NYPD's Rule 56 motion for summary judgment as to Rusfeldt's free exercise claim. Dkt. 117.

On June 16–18, 2025, Rusfeldt's First and Fourth Amendment claims were tried to a jury. During trial, Rusfeldt moved for judgment as a matter of law under Rule 50(a). The district court denied the motion and sent the case to the jury. On June 18, 2025, the jury returned a verdict for the NYPD. Dkt. 163.

On July 16, 2025, Rusfeldt renewed his motion for judgment as a matter of law under Rule 50(b), asking in the alternative for a new trial under Rule 59. Dkt. 166. On October 2, 2025, the district court denied the motion. Dkt. 171. On October 6, 2025, the district court entered judgment for the NYPD. Dkt. 172. The judgment is a final order that disposes of all parties' claims.

On November 3, 2025, Rusfeldt timely appealed. Dkt. 173. Rusfeldt contends that the district court erred in denying his Rule 56 motion, his Rule 50 motion, and his Rule 59 motion. This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] Rusfeldt also asserted personal capacity claims against former NYPD Assistant Chief Stephen Hughes. The jury found for Hughes. Rusfeldt does not challenge the judgment as to Hughes.

## STATEMENT OF THE ISSUES

The issues on appeal are:

1.      Do the police engage in viewpoint discrimination as a matter of law when they order a speaker to disperse due to listeners' reaction to his speech, even if the police are motivated by an intent to promote public order?

2.      Did the NYPD engage in viewpoint discrimination against Rusfeldt where it failed to dispute—and the facts establish—that NYPD officers ordered Rusfeldt to disperse due to listeners' reaction to his speech?

3.      Did the NYPD satisfy strict scrutiny where it failed to dispute—and the facts establish—that the NYPD lacked a compelling interest and that its actions were neither necessary nor the least restrictive means available?

4.      Are plaintiffs who bring a First Amendment heckler's veto claim required to prove the absence of probable cause even though they are not required to prove officers had a retaliatory animus against them?

5.      In the alternative, is Rusfeldt entitled to a new trial because of the district court's erroneous and prejudicial jury charge?

## STATEMENT OF THE CASE

This is a heckler's veto case against the NYPD. The district court, Senior District Judge P. Kevin Castel presiding, denied Rusfeldt's Rule 56 motion in full and granted the NYPD's Rule 56 motion as to Rusfeldt's free exercise claim.

*Rusfeldt v. N.Y.C.*, No. 22-CV-594 (PKC), 2024 WL 4354874 (S.D.N.Y. Sep. 30, 2024); *see also* Special Appendix ("SA") at 1–32. At the trial of Rusfeldt's First and Fourth Amendment claims, the district court denied his Rule 50(a) motion and sent the case to the jury. The jury found for the NYPD.

After trial, Rusfeldt renewed his motion under Rule 50(b), asking in the alternative for a new trial under Rule 59. The district court denied the motion, *Rusfeldt v. N.Y.C.*, No. 22-CV-594 (PKC), 2025 WL 2808822 (S.D.N.Y. Oct. 2, 2025); *see also* SA33–46, and entered judgment for the NYPD, SA47. The district court erred in denying Rusfeldt's Rule 56 motion, his Rule 50 motion, and his Rule 59 motion.

## I.    FACTUAL BACKGROUND

There are two factual records at issue in this appeal—the summary judgment record and the trial record. Rusfeldt is entitled to summary judgment under Rule 56 on all his claims on the summary judgment record. He is also entitled to judgment as a matter of law under Rule 50 on his First and Fourth Amendment claims—the claims that went to trial—on the trial record.

The two records are not materially different. They both contain the same full video of the incident, the same core set of documents, and similar trial and deposition testimony. The statement of facts below primarily relies on the video and documentary evidence. When it cites testimony, it cites trial testimony first with a

"*see also*" cite to deposition testimony.

## A. Rusfeldt

Rusfeldt is the pastor of a small church. Trial Tr. at 37–38; *see also* Dkt. 99-2 at 16. He believes that LGBTQ+ conduct is sinful and that God has called him to proclaim that message in public places. Trial Tr. at 38–40, 42, 45, 137–138; *see also* Dkt. 99-2 at 16–17, 22–23, 31, 77. He recognizes that some people will take offense to his speech, but he believes he has a religious obligation to engage in it. Trial Tr. at 38–40, 45; *see also* Dkt. 99-2 at 22–24.

## B. NYC Pride

NYC Pride is an annual parade held in lower Manhattan to celebrate the LGBTQ+ community. Trial Tr. at 205, 271; *see also* Dkt. 99-3 at 68–70. In 2021, in addition to the Pride Parade itself, two other smaller parades and a street festival called PrideFest were planned. Dkt 180-4; Dkt. 180-5; Dkt. 180-6; Dkt. 180-7; Trial Tr. at 204–217; *see also* Dkt. 99-3 at 71–72. While there were no permitted events at Washington Square Park (the "Park"), the Park is an informal gathering place for Pride celebrants. Trial Tr. at 211–12; *see also* Dkt. 99-4 at 101.

On the day of the Pride Parade—June 27, 2021—the NYPD had extraordinary resources deployed in lower Manhattan. Around 1,000 officers were on duty, 400 of whom were stationed in the precinct where the Park is located, fifty of whom were stationed in the Park itself. Dkt 180-4; Dkt. 180-5; Dkt. 180-6; Dkt. 180-7; Trial Tr.

at 204–217; *see also* Dkt. 99-3 at 72. In addition, the Strategic Response Group—a 700-officer contingent that responds to large demonstrations—was on standby. Trial Tr. at 234, 268–69; *see also* Dkt. 99-3 at 214–16. The Strategic Response Group has riot gear and a long-range acoustical device ("LRAD") it uses to deliver dispersal orders to large crowds. Trial Tr. at 234, 237–38; *see also* Dkt. 99-3 at 214–16.

According to Hughes, the NYPD had ample police presence in lower Manhattan to address any threats that might arise. Trial Tr. at 217; *see also* Dkt. 99-3 at 96.

### C. Rusfeldt goes to the Park to Proselytize

On the day of the Parade, Rusfeldt traveled to the Park with his wife and two other individuals to share his religious views. Trial Tr. at 48; *see also* Dkt. 99-2 at 17, 100–01. Rusfeldt's wife recorded the incident on video. Trial Tr. at 49–50; *see also* Dkt. 99-2 at 57.[2]

Rusfeldt and his companions arrived in the mid-afternoon and positioned themselves on the northeast sidewalk of Washington Square East at the intersection with West 4th Street, across the street from the Park. Video 1 at 0:15; Trial Tr. at 53; *see also* Dkt. 99-3 at 122. Below is a map of the area, oriented with North at the top:

---

[2] The Deferred Joint Appendix will contain a USB drive that has electronic copies of the video. Dkt. 180-10. The video is broken into three files—named Video 1, Video 2, and Video 3—which are in chronological order.



West 4th Street is red. Washington Square East is blue. Washington Place is yellow. Broadway is green. Rusfeldt was located at the purple circle.

When Pastor Aden and his group arrived at the Park, the environment was festive, with people milling about and music audible. Video 1 at 0:01–3:00. Due to the day's events, the NYPD allowed pedestrians to congregate on Washington Square East. Trial Tr. at 244; *see also* Dkt. 99-3 at 122–23. The NYPD had thus placed portable metal barricades on Washington Square East at the intersection with West 4th Street. Video 1 at 0:15; Trial Tr. at 49, 52–53; *see also* Dkt. 99-3 at 122–23. West 4th Street remained open to through traffic.

No permit covered the area where Rusfeldt's group was located. The only permitted events in lower Manhattan were the Pride Parade and Pridefest, and the Park was far off the Pride Parade route and several blocks away from Pridefest. Trial Tr. at 204–17, 228; Dkt. 180-7 at 2; Dkt. 180-5 at 4; *see also* Dkt. 99-12 at 4.[3]

During the entire incident, Rusfeldt and his companions never blocked the sidewalk or road, and they were peaceful throughout. *See generally* Videos 1–3; Trial Tr. at 53; *see also* Dkt. 99-2 at 32; Dkt. 99-9 at 27.

### D. Rusfeldt's Sign and the Crowd's Hostile Reaction to it

When Rusfeldt arrived, there were five NYPD officers—including Officer Nicholas Pounds—standing across Washington Square East. Video 1 at 4:58; Trial Tr. at 53–54, 174; *see also* Dkt. 99-9 at 18. Once situated, Rusfeldt hoisted a crudely worded sign condemning LGBTQ+ conduct. Video 1 at 3:10.[4] At that time, one of Rusfeldt's companions began to speak a message that criticized LGBTQ+ conduct. Video 1 at 3:40. The NYPD admitted that Rusfeldt was not violating any law when

––––––––––––––––––––––

[3] In its Order denying Rusfeldt's Rule 50 motion, the district court asserted that Rusfeldt was located within the boundaries of Pridefest. SA33, 35, 41. That assertion is clearly erroneous. Rusfeldt was located several blocks away from Pridefest's boundaries.

[4] Below, the NYPD admitted that the words on Rusfeldt's sign were protected. Trial Tr. at 107; *see also* Dkt. 99-12 at 3. The sign's message is thus not relevant to this appeal. In any event, the sign said, "Fags and Whores Burn in Hell. Repent; Obey Jesus." Trial Tr. at 55; *see also* Dkt. 99-2 at 60.

he first hoisted his sign. Trial Tr. at 174–75, 183, 231, 236; *see also* Dkt. 99-9 at 20, 26–27. As Hughes put it, Rusfeldt was simply engaging in "free speech." Trial Tr. at 231; *see also* Dkt. 99-3 at 129–31, 188, 216; Dkt. 99-9 at 45–46.

A crowd formed around Rusfeldt and his companions due, in part, to the sign's message. Video 1 at 3:40–15:57; Trial Tr. at 60–62, 175, 200; *see also* Dkt. 99-3 at 128–29; Dkt 99-4 at 18, 23, 34, 65–66; Dkt. 99-9 at 19–20. The crowd, which grew to about 200 people, heckled Rusfeldt and his companions. Video 1 at 3:40–15:57; Trial Tr. at 60–61, 175, 185; *see also* Dkt. 99-9 at 19–20. Most of the people in the crowd were in Washington Square East (where they were allowed to be), but some people overflowed onto West 4th Street (where they were not allowed to be). Video 1 at 3:40–15:57; Trial Tr. at 176, 184; *see also* Dkt. 99-4 at 26, 34, 37.

### E. The NYPD Orders Rusfeldt to Disperse

After about fifteen minutes, people in the crowd began throwing plastic water bottles at Rusfeldt due, in part, to their disagreement with his sign. Video 1 at 15:58–16:29; Trial Tr. at 60–62, 175–76, 200; *see also* Dkt. 99-9 at 19–23. Based on the crowd's actions, the five NYPD officers stationed across the street intervened. Video 1 at 16:30; Trial Tr. at 62, 176–77, 201; *see also* Dkt. 99-9 at 19–23. But rather than direct their efforts at controlling the crowd, the officers directed their efforts at Rusfeldt, ordering him to "shut it down," lower his sign, and leave the area. Video 1 at 16:35–17:45; *see also* Dkt. 99-9 at 20–25. Pounds testified that the NYPD's goal

was to get Rusfeldt and his sign out of the crowd's sight. Trial Tr. at 177, 195, 201; *see also* Dkt. 99-3 at 152–54; Dkt. 99-9 at 25–28.

Rusfeldt politely declined, citing his First Amendment rights. Video 1 at 16:52. The officers positioned themselves between Rusfeldt and the crowd while they contacted their superiors. Video 1 at 17:40; *see also* Trial Tr. at 178. After that time, the crowd stopped throwing bottles. Video 1 at 19:27 *et seq*; *see also* Trial Tr. at 170.

One of the officers on the scene told Rusfeldt that the NYPD was ordering him to leave because he "was causing a crowd to come to our corner." Video 1 at 21:53. That same officer later admitted to Rusfeldt that the NYPD was ordering him to leave—and not the crowd—because he was "more cordial" than the crowd. Video 1 at 22:24.

About fifteen minutes later, NYPD Captain Mark Turner arrived with additional officers. Video 1 at 31:33; Trial Tr. at 229–30; *see also* Dkt. 99-4 at 25–27. The NYPD also brought in barricades to create greater separation between Rusfeldt and the crowd. Video 2 at 5:16–38. There is no evidence that the NYPD ever stationed an officer at West 4th Street or took any other measures to keep people out of that road.

About thirty minutes later, Hughes arrived. Video 3 at 0:53; Trial Tr. at 229, 238; *see also* Dkt. 99-3 at 167–68. After speaking with Pounds and Turner about

what they had witnessed and observing the situation himself, Hughes was concerned that the crowd posed a threat to traffic flow on West 4th Street and to public safety generally. Trial Tr. at 229–33, 239, 247; *see also* Dkt. 99-3 at 167–68, 189. Even though the NYPD could have continued to "handle [the] crowd," Trial Tr. at 180–81; *see also* Dkt. 99-9 at 41, Hughes decided to deal with the crowd by ending Rusfeldt's demonstration, Trial Tr. at 179, 233–34; *see also* Dkt. 99-3 at 156–57, 159–60, 172.

Hughes commanded the Strategic Response Group to stage three blocks away. Trial Tr. at 234; *see also* Dkt. 99-3 at 172, 187, 214–216. At Hughes' direction, Pounds and another officer ordered Rusfeldt to leave the area, this time telling him that he would be arrested if he did not comply. Video 3 at 0:03–0:15; Trial Tr. at 179; *see also* Dkt. 99-3 at 184–86. Rusfeldt lowered his sign and began to leave. Video 3 at 2:25–31. As he did so, the crowd cheered. *Id.*

Rusfeldt walked north on the eastern sidewalk along Washington Square East. Video 3 at 2:38–43. After briefly pausing, he continued to Washington Place, where he turned right. Video 3 at 4:16–6:50. Once on Washington Place, Rusfeldt stopped because he did not want to leave "sight and sound" of his intended audience at the Park. Video 3 at 6:51–54; Trial Tr. at 161, 171; *see also* Dkt. 99-2 at 100–01.

### F. The NYPD Arrests Rusfeldt

After Rusfeldt stopped on Washington Place, Hughes told Rusfeldt that he was "antagonizing" the crowd with his sign. Video 3 at 7:13–22. When Rusfeldt failed to comply with another order to leave the area, the NYPD arrested him for violating NYPL § 240.20(6).[5] Video 3 at 9:55–12:23; Dkt. 180-3 at 2–3; Trial Tr. at 75, 253; *see also* Dkt. 99-3 at 154. According to Hughes, the basis for the arrest was Rusfeldt's failure to comply with Pounds' original dispersal order. Trial Tr. at 248, 253; *see also* Dkt. 99-3 at 154.[6]

The charges were later dropped. Trial Tr. at 77; *see also* Dkt. 99-2 at 19.

Throughout the event, the NYPD never gave a dispersal order to the crowd, nor did it arrest anyone in the crowd. *See generally* Videos 1-3; Trial Tr. at 74–75,

---

[5] Section 240.20(6) provides that

> [a] person is guilty of disorderly conduct when, with the intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof . . . [h]e congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse[.]

SA48.

[6] Rusfeldt was also charged with disorderly conduct under NYPL § 240.20(7). At trial, however, the district court concluded that the NYPD could not rely on § 240.20(7) because Rusfeldt's constitutionally protected speech constituted a "legitimate purpose" under that section. Trial Tr. at 291. That conclusion was correct. For this reason, § 240.20(7) is not pertinent to this appeal.

178, 237; *see also* Dkt. 99-3 at 231–232; Dkt. 99-12 at 9. Instead, the NYPD perceived Rusfeldt to be the source of the disturbance, and it sought to control the crowd by ordering him to leave the area. Trial Tr. at 175–77, 233–24; *see also* Dkt. 99-3 at 131–32, 156–57, 159, 172; Dkt. 99-4 at 65–70; Dkt. 99-9 at 23, 28. And as Pounds admitted, "by telling [Rusfeldt] to move . . . , [the NYPD] gave [the crowd] what they wanted"—that is, to keep him from speaking at the Park. Trial Tr. at 200.

## II.   PROCEDURAL HISTORY

### A. Pretrial

On January 21, 2022, Rusfeldt filed his Complaint. Dkt. 1. He later filed a First Amended Complaint with minor amendments. Dkt. 83.

On December 7, 2022, the district court ordered phased discovery. Dkt. 67. Phase 1 was limited to whether the NYPD violated Rusfeldt's constitutional rights and damages. *Id.* Phase 2 was to involve the NYPD's liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Id.*

On October 26, 2023, Rusfeldt moved for Phase 1 summary judgment, contending that the NYPD's dispersal orders and his arrest violated his constitutional rights under the heckler's veto doctrine as a matter of law. Dkt. 98; Dkt. 99. On December 21, 2023, the NYPD cross-moved for summary judgment. Dkt. 107. The NYPD argued that there was no such thing as the heckler's veto doctrine and that its dispersal orders were permissible because officers were subjectively motivated by

the sole intent to "promote . . . public order" and their orders were not "purely arbitrary." Dkt. 109 at 11, 35–40.

On September 30, 2024, the district court granted the NYPD's motion as to Rusfeldt's free exercise claim, concluding that the NYPD's actions toward him were neutral and generally applicable. SA27–28. The district court denied the parties' cross-motions as to Rusfeldt's First and Fourth Amendment claims. SA1–28. The district court did not opine on whether the heckler's veto doctrine existed, whether it applied on the facts here, or whether the NYPD satisfied strict scrutiny. *Id.*

On February 7, 2025, Rusfeldt filed his proposed jury charges for the trial of his First and Fourth Amendment claims. Dkt. 125. The proposed charges were based on the heckler's veto doctrine. Dkt. 125 at 13–14, 19–20. At the pretrial conference on April 15, 2025, the district court announced its view that there was "no such thing as the [h]eckler's veto doctrine." Dkt. 147 at 8. For this reason, the district court stated that it would "not charg[e] the jury on a [h]eckler's veto doctrine." Dkt. 147 at 9. Instead, the district court said that it was conceptualizing Rusfeldt's First Amendment claim as a retaliation claim and that it would charge the jury accordingly. Dkt. 147 at 7, 9.

**B. Trial**

The case was tried on June 16–18, 2025. During trial, Rusfeldt moved for judgment as a matter of law. Trial Tr. at 278–92; *see also* Dkt. 128 (incorporated by

16

reference). The district court denied the motion and sent the case to the jury.

As relevant, the charge on Rusfeldt's Fourth Amendment claim stated that probable cause was a defense and that probable cause existed under § 240.20(6) if the NYPD reasonably believed that Rusfeldt had failed to comply with a "lawful" order to disperse. Trial Tr. at 373–75. The charge stated that an order to disperse is "lawful" if "its purpose is to promote public order and [it] was not . . . purely arbitrary . . . . An order that is motivated by an intent to suppress or discriminate against a particular viewpoint is not [lawful]." Trial Tr. at 375.

As for Rusfeldt's First Amendment claim, the charge stated that Rusfeldt must demonstrate either: (1) (a) that the NYPD had a "motive to retaliate against him because of his . . . speech" and (b) the absence of probable cause under § 240.20(6); or (2) that the NYPD typically exercised its discretion not to arrest similarly situated individuals but it arrested him "because of his . . . speech." Trial Tr. at 377.

On June 18, 2025, the jury returned a verdict for the NYPD. Dkt. 163.

### C. Post-trial

On July 16, 2025, Rusfeldt renewed his motion for judgment as a matter of law, asking in the alternative for a new trial based on the erroneous jury charge. Dkt. 166. On October 2, 2025, the district court denied the motion. SA33–46. As for Rusfeldt's Fourth Amendment claim, the district court concluded that a reasonable jury could have found that probable cause existed under § 240.20(6). SA40.

According to the district court, there was sufficient evidence that officers subjectively intended to "promote public order" and that their dispersal orders were not "purely arbitrary" under *Kass v. City of New York*, 864 F.3d 200 (2d Cir. 2017). *Id.* The district court concluded that the dispersal orders did not violate the First Amendment because officers "were not motivated by their feelings towards either Rusfeldt's or the crowd's message." *Id.*

As for Rusfeldt's First Amendment claim, the district court concluded that Rusfeldt was required to prove the absence of probable cause under *Nieves v. Bartlett*, 587 U.S. 391 (2019), and that the jury could reasonably have found that he failed to satisfy this burden. SA40–41. The district court also concluded that Rusfeldt did not satisfy *Nieves*' exception because a reasonable jury could have found that Rusfeldt was not similarly situated to the crowd. SA41.

The district court also held that the jury charge was correct. SA43–46.

On October 6, 2025, the district court entered judgment for the City. SA47. On November 3, 2025, Rusfeldt appealed. Dkt. 173.

## SUMMARY OF THE ARGUMENT

The district court erroneously denied Rusfeldt's Rule 56 motion for summary judgment, Rusfeldt's Rule 50 motion for judgment as a matter of law, and Rusfeldt's alternative request for a new trial.

1.     The judgment rests on a fundamental legal error under the First Amendment, not disputed facts. Specifically, the district court erroneously concluded that there was "no such thing as the [h]eckler's veto doctrine." And even if this appeal involved disputed facts, the Court should review the facts de novo under the constitutional fact doctrine. Either way, Rusfeldt is entitled to judgment under Rules 56 and 50.

2.     Under the heckler's veto doctrine, the police engage in viewpoint discrimination as a matter of law when they regulate a speaker due to listeners' reaction to his speech. In *Forsyth County*, the Supreme Court held that the heckler's veto doctrine applies even if the government's sole regulatory motivation is "maintaining public order." Under *Forsyth County*, the police engage in viewpoint discrimination as a matter of law when they order a speaker to disperse due to listeners' reaction to his speech, regardless of officers' subjective motivations.

Contrary to the district court's conclusion, *Kass* does not suggest otherwise. The relevant language in *Kass* sets forth the legal standard for determining whether

dispersal orders are lawful under *New York statutory law*. It does not set forth the governing standard under *the First Amendment*, which is strict scrutiny here.

3. Because the district court rejected the heckler's veto doctrine, it never evaluated whether the doctrine applies here or whether the NYPD satisfied strict scrutiny. And the NYPD did not address these questions below, so it has waived them. For this reason alone, Rusfeldt is entitled to judgment.

In any event, as a matter of law, the heckler's veto doctrine applies, and the NYPD did not satisfy strict scrutiny. It is undisputed that Rusfeldt was peacefully engaging in protected speech in a traditional public forum; that a crowd gathered and began throwing bottles at him in response to his speech; and that the NYPD ordered him to disperse due to the crowd's actions. Accordingly, the NYPD's dispersal orders were viewpoint discriminatory as a matter of law.

Strict scrutiny applies, and the NYPD cannot satisfy it as a matter of law. While public safety can be a compelling interest in certain situations, it is not one here because NYPD officers already on the scene failed to intervene before the crowd started throwing bottles despite the obvious threat to public safety. And the crowd stopped throwing bottles after the NYPD intervened, so it was unnecessary for the NYPD to continue ordering Rusfeldt to disperse, much less to arrest him. The NYPD could have dealt with the crowd in other ways that were less restrictive of Rusfeldt's speech, like bringing in additional barricades, stationing additional

officers on the scene, issuing warnings to the crowd, and ordering the crowd to disperse. And even if the crowd had been beyond the NYPD's control, the NYPD had ample resources available to issue a general dispersal order to everyone on the scene. Instead, the NYPD chose the option that was most restrictive of Rusfeldt's speech: ordering him—and only him—to disperse and arresting him for failing to comply.

4. Because the NYPD violated the heckler's veto doctrine as a matter of law, the remaining questions on appeal largely resolve themselves.

First, Rusfeldt is entitled to judgment under Rules 56 and 50 on his First Amendment claim because the NYPD violated the heckler's veto doctrine as a matter of law. Moreover, Rusfeldt can recover damages arising both from his arrest and from lowering his sign and leaving the original streetcorner.

Second, Rusfeldt is entitled to judgment under Rules 56 and 50 on his Fourth Amendment claim. It is undisputed that Rusfeldt satisfied the elements of this claim. And while probable cause is a defense, the NYPD did not have probable cause under § 240.20(6) because its dispersal orders violated the heckler's veto doctrine. Rusfeldt's failure to comply with an unconstitutional dispersal order cannot give rise to probable cause as a matter of law.

Third, Rusfeldt is entitled to judgment under Rule 56 on his free exercise claim. He was exercising his religion, and the NYPD engaged in viewpoint

discrimination against him as a matter of law. Viewpoint discrimination is neither neutral nor generally applicable towards religion. Strict scrutiny thus applies, and the NYPD cannot satisfy strict scrutiny as a matter of law.

5. *Nieves* has no impact on this case. *Nieves* held that plaintiffs bringing First Amendment retaliatory arrest claims based on officers' retaliatory animus must generally prove the absence of probable cause. Even if *Nieves* applied to heckler's veto claims, Rusfeldt satisfies *Nieves* because probable cause does not exist as a matter of law.

In any event, *Nieves* does not apply to heckler's veto claims. *Nieves* is premised on the complex causation problems inherent in proving that officers' retaliatory animus caused the arrest. But heckler's veto claims do not present complex causation problems because they do not turn on officer animus. *Nieves* therefore does not apply to heckler's veto claims as a matter of law.

Even if *Nieves* applied to heckler's veto claims, the *Nieves* exception applies here. That exception applies when the police do not take regulatory action against similarly situated comparators not engaging in similar speech as the plaintiff. Because the NYPD took regulatory action against Rusfeldt but not the crowd, the *Nieves* exception applies as a matter of law.

6. In the alternative, Rusfeldt is entitled to a new trial based on the jury charge. The charge erroneously: (1) failed to instruct the jury on the heckler's veto

doctrine; (2) reframed Rusfeldt's First Amendment claim as a retaliation claim; (3) required Rusfeldt to prove the absence of probable cause or that the *Nieves* exception applied to prevail on his First Amendment claim; and (4) limited the damages Rusfeldt could recover under his First Amendment claim. These errors prejudiced Rusfeldt and require a new trial, at least.

The Court should REVERSE the judgment and REMAND for further proceedings. In the alternative, the Court should VACATE the judgment and REMAND for a new Phase 1 trial.

## STANDARD OF REVIEW

This Court reviews the district court's Rule 56 and Rule 50 rulings de novo. *Keeling v. Hars*, 809 F.3d 43, 47 (2d Cir. 2015) (Rule 56); *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014) (Rule 50). This Court reviews the district court's Rule 59 rulings for abuse of discretion. *Song v. Ives Lab'ys*, 957 F.2d 1041, 1047 (2d Cir. 1992). The district court abuses its discretion when it commits an error of law. *Am. Trucking Ass'n v. N.Y. Thruway Auth.*, 795 F.3d 351, 356 (2d Cir. 2015).

## ARGUMENT

The judgment was based on a fundamental legal error under the First Amendment. The district court should have granted Rusfeldt's Rule 56 motion, his Rule 50 motion, and, in the alternative, his Rule 59 motion.

## I.    THIS APPEAL TURNS ON QUESTIONS OF CONSTITUTIONAL LAW, NOT DISPUTED FACTS

In denying Rusfeldt's Rule 50 motion, the district court deferred heavily to the jury's verdict, repeatedly concluding that "a reasonable jury" could have found for the NYPD. SA34, 39, 41. But because Rusfeldt raises dispositive legal arguments, the jury's verdict has no legal relevance. And even if this appeal required resolution of disputed facts, the Court must review the whole record de novo under the constitutional fact doctrine. Either way, Rusfeldt is entitled to judgment as a matter of law.

### A. Rusfeldt raises questions of law.

Courts—not juries—are "expositor[s] of [the] law." *Miller v. Fenton*, 474 U.S. 104, 114 (1985). A question of law is one that "can be resolved without reference to any disputed facts." *Dupree v. Younger*, 598 U.S. 729, 735 (2023); *see also Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 24 (2021) (concluding that a question of law is one that "entails primarily legal . . . work").

Here, Rusfeldt raises questions of law. Each of the issues on appeal presents either a pure legal question or turns on undisputed facts. *See* Statement of the Issues, *supra,* at 5. Accordingly, the jury's verdict has no legal relevance to this appeal. *Dupree*, 598 U.S. at 735; *see also Walker v. Schult*, 45 F.4th 598, 617 (2d Cir. 2022) (noting that courts must "not defer to the jury's legal conclusion [regarding whether the] facts violate the Constitution" (cleaned up)); *Walczyk v. Rio*, 496 F.3d 139, 157

(2d Cir. 2007) (noting that "the existence of probable cause is a question of law" where there are no disputed facts); *United States v. Friday*, 525 F.3d 938, 949 (10th Cir. 2008) (holding that whether the government satisfies strict scrutiny is a question of law). Indeed, the district court should have granted summary judgment to Rusfeldt under Rule 56 long before trial. *See Dupree*, 598 U.S. at 735 (holding that denial of summary judgment predicated on legal error is reviewable after trial). Whether under Rule 56 or Rule 50, Rusfeldt is entitled to judgment as a matter of law.

**B. The constitutional fact doctrine applies.**

Even if Rusfeldt's appeal involved disputed facts, the constitutional fact doctrine forbids deference to the jury's verdict. Under that doctrine, in cases implicating the First Amendment, courts must "make an independent examination of the whole record . . . to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (cleaned up). In other words, courts must review the core facts underlying the verdict "de novo." *A.H. v. French*, 985 F.3d 165, 175 (2d Cir. 2021). This rule protects speech against the possibility that the jury will find against a speaker because they "dislike . . . [his] expression." *Snyder*, 562 U.S. at 458; *see also Miller*, 474 U.S. at 114 (similar).

Even if this appeal involved disputed facts, the constitutional fact doctrine applies. Given the offensive nature of Rusfeldt's speech, this is the quintessential

case for its application. *Snyder*, 562 U.S. at 458. And under a de novo review of the whole record, Rusfeldt is entitled to judgment as a matter of law.

## II. THE DISTRICT COURT ERRONEOUSLY CONCLUDED THAT THERE WAS "NO SUCH THING AS THE HECKLER'S VETO DOCTRINE"

The district court concluded that there was "no such thing as the [h]eckler's veto doctrine." Dkt. 147 at 8; *see also* SA34 (concluding that there is no "separate 'hecklers' veto' claim"). That was wrong. The heckler's veto doctrine is firmly grounded in decades of Supreme Court precedent. Under that doctrine, the police engage in viewpoint discrimination as a matter of law when they regulate a speaker due to listeners' reaction to his speech. And contrary to the district court's conclusion, the heckler's veto doctrine applies even if officers' dispersal orders are subjectively motivated solely by the intent to "promote public order."

### A. Regulating a speaker due to listeners' reaction to his speech constitutes viewpoint discrimination as a matter of law, triggering strict scrutiny.

Governmental restrictions of speech on government property are evaluated under a three-part analysis: (1) whether the speech is protected; (2) the type of forum; and (3) whether the restriction satisfies the appropriate level of scrutiny. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1995); *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996). The police restrict speech when they order a speaker to relocate and arrest him for failing to comply.

26

*Friend v. Gasparino*, 61 F.4th 77, 91–93 (2d Cir. 2023); *see also Meinecke v. City of Seattle*, 99 F.4th 514, 522 (9th Cir. 2024).

Here, the NYPD admitted that Rusfeldt's speech was protected and that the sidewalk where he was standing was a traditional public forum. Trial Tr. at 107, 377; *see also* Dkt. 99-12 at 3–4. Thus, only question is whether the NYPD's dispersal orders to—and arrest of—Rusfeldt satisfied the appropriate level of scrutiny.

The appropriate level of scrutiny depends on whether the restriction on speech is content neutral or content based. Content-neutral restrictions are subject to intermediate scrutiny. *McCullen v. Coakley*, 573 U.S. 464, 477 (2014). Content-based restrictions, by contrast, must comply with strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 164–65 (2015).

"Government regulation of speech is content based if a law applies . . . because of the topic discussed or the idea or message expressed." *Id.* at 163. While content discrimination is often obvious—like a statute that defines regulated speech by subject matter—it is sometimes "more subtle." *Id.*

The heckler's veto doctrine accounts for one of these more subtle types of content discrimination. Under this doctrine, "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cnty. v. Nat'list Movement*, 505 U.S. 123, 134 (1992). In other words, the government engages in content discrimination as a matter of law when it restricts speech "due to the lawless reaction of those who

hear it." *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 248 (6th Cir. 2015) (*en banc*); *see also Meinecke*, 99 F.4th at 522 (similar). As this Court has explained, "[t]ying a . . . speaker's constitutional right to free expression solely to the reaction that speech garners from upset or angry listeners cannot be squared with [the First Amendment]." *Leroy v. Livingston Manor Cent. Sch. Dist.*, 158 F.4th 414, 426 (2d Cir. 2025).

Restricting speech due to listeners' reaction to it is not merely content-based; it is viewpoint discriminatory. *Bible Believers*, 805 F.3d at 248. Regulating speech because it is "offensive" to others constitutes "viewpoint discrimination." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 31 (2d Cir. 2018); *see also Matal v. Tam*, 582 U.S. 218, 243 (2017) ("Giving offense is a viewpoint.").

Taking regulatory action against a speaker due to listeners' reaction to his speech is viewpoint discriminatory even if the police do not personally "disagree[] with the [speaker's] message." *Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 972 F.2d 365, 373 (D.C. Cir. 1992). Officers' "own views" about the speech at issue are irrelevant. *Id.* Instead, when the police regulate a speaker due to listeners' reaction to his speech, they "ratify" the listeners' viewpoint discrimination as a matter of law. *Bible Believers*, 805 F.3d at 251; *Ctr. for Bio–Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 789 (9th Cir. 2008) . As this Court has recognized, "allowing the public, with the government's

help, to shout down unpopular ideas that stir anger is generally not permitted." *Melzer v. Bd. of Educ. of City Sch. Dist. of N.Y.C.*, 336 F.3d 185, 199 (2d Cir. 2003).

While taking regulatory action against a speaker due to listeners' reaction to his speech is not per se impermissible, it is subject to strict scrutiny. *Meinecke*, 99 F.4th at 524–25; *Bible Believers*, 805 F.3d at 252–53; *Christian Knights*, 972 F.2d at 374. Under strict scrutiny, the government must show that the restriction on speech is "narrowly tailored to promote a compelling . . . interest." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 817 (1992). Narrow tailoring requires that the restriction be "necessary to serve the asserted compelling interest, precisely tailored to serve that interest, and the least restrictive means readily available for that purpose." *Friend*, 61 F.4th at 91. When presented with "plausible, less restrictive alternatives," the government must "prove the [proposed] alternative[s] to be ineffective." *Playboy*, 529 U.S. at 823.

To comply with strict scrutiny when listeners threaten or engage in violence in reaction to speech, the police must protect the speech by taking actions like "cordon[ing] off the speakers," bringing in additional officers, "warn[ing] the [hecklers]" that they will be arrested if they engage in unlawful acts, and ordering the hecklers to disperse. *Bible Believers*, 805 F.3d at 252; *Meinecke*, 99 F.4th at 525. And if the hecklers are beyond the police's control, the police may "attempt to disperse the entire crowd," speaker and listener alike. *Bible Believers*, 805 F.3d at

252. But the police "may not silence the speaker as an expedient alternative" to controlling hostile listeners. *Id.*; *see also Meinecke*, 99 F.4th at 525 (similar).

### B. The heckler's veto doctrine applies even if the police are subjectively motivated solely by the intent to promote public order.

The district court rejected these bedrock First Amendment principles. According to the district court, the police do not engage in viewpoint discrimination when they order a speaker to disperse due to listeners' reaction to his speech if they have the subjective motivation to "promote public order." SA40. In the district court's view, to engage in viewpoint discrimination, the police must have the subjective "intent to suppress or discriminate against [the speaker's] viewpoint." *Id.*

That rule is foreclosed by *Forsyth County*. And the lone published case the district court cited in support—this Court's decision in *Kass*—does not support its rule.

### 1. The district court's rule is foreclosed by *Forsyth County*.

*Forsyth County* involved a challenge to an ordinance that allowed the government to charge speakers different permit fees based on whether listeners were likely to disrupt public order in response. 505 U.S. at 134. The government argued that the ordinance was content neutral because it did not allow consideration of the content of the speech but only the costs of "maintaining public order." *Id.* The Supreme Court disagreed, noting that crowds who disrupt public order in response to speech are reacting to the speaker's "message." *Id.* at 134 n.12. Because of this

30

close nexus between the content of speech and listeners' reaction to it, the Supreme Court held that "[l]isteners' reaction [to speech] is not a content-neutral basis for regulation," even if the government's sole regulatory intent is "maintaining public order." *Id.* at 134; *see also Hous. Works, Inc. v. Kerik*, 283 F.3d 471, 479 (2d Cir. 2002) (same).

Under *Forsyth County*, officers' subjective motivations are irrelevant. 505 U.S. at 134. Instead, the sole question is whether the police regulated the speaker "due to" listeners' reaction to his speech. *Bible Believers*, 805 F.3d at 248. If they did, the fact that officers may have had a "benign motive" does not transform their viewpoint-based regulation to a content-neutral one. *Reed*, 576 U.S. at 165; *see also Bachellar v. Maryland*, 397 U.S. 564, 567 (1970) (reversing conviction predicated on listeners' reaction to speech without evaluating officers' subjective motivations); *Gregory v. City of Chicago*, 394 U.S. 111, 112 (1969) (same); *Cox v. Louisiana*, 379 U.S. 536, 550 (1965) (same); *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963) (same); *Terminiello v. City of Chicago*, 337 U.S. 1, 4–5 (1949) (same). The Supreme Court has repeatedly held that speakers are not required to "adduce . . . evidence of a censorial motive" for a restriction on speech to be content based. *Reed*, 576 U.S. at 165 (quotations omitted).

Consistent with *Forsyth County*, every Circuit that has squarely considered the question has rejected the district court's conclusion that officers' subjective

motivations matter. In *Meinecke*, the Ninth Circuit concluded that the heckler's veto doctrine applied even though the police were merely responding in good faith to the "threat to public safety" posed by listeners. 99 F.4th at 523 (cleaned up); *see also Bio–Ethical Reform*, 533 F.3d 788 (similar). In *Bible Believers*, the Sixth Circuit brushed aside the government's argument that the heckler's veto doctrine did not apply because officers' "only consideration was maintaining safety," noting that the threat to safety was caused by "listener reaction" to speech. 805 F.3d at 247. And in *Christian Knights*, the D.C. Circuit concluded that the heckler's veto doctrine applied even though the government was motivated solely by "a genuine concern for . . . safety," noting that the government's "own views" about the speech are irrelevant. 972 F.2d at 373. *Accord Deferio v. City of Syracuse*, 306 F. Supp. 3d 492, 512 (N.D.N.Y. 2018) (holding that taking regulatory action against a speaker due to "listeners' reaction to speech" constituted viewpoint discrimination even though the police acted solely in the pursuit of public "safety"). Adopting the district court's rule would not only contravene *Forsyth County*, it would create a Circuit split.

The district court's rule also undermines the speech-protective purposes of the heckler's veto doctrine. That doctrine recognizes that ideological diversity is crucial to democratic governance and that public discussion must therefore be wide open and not restricted by mob rule. As the Supreme Court concluded over seventy-five years ago:

> The vitality of civil and political institutions in our society depends on free discussion . . . . Accordingly[,] a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it . . . . stir[s] people to anger, invite[s] public dispute, [or] br[ings] about a condition of unrest.

*Terminiello*, 337 U.S. at 4. Because a heckler's veto "will nearly always be susceptible to being reimagined . . . as a means for protecting the public," *Bible Believers*, 805 F.3d at 255, the district court's rule would grant angry crowds far too much power to enlist the police to help them silence unpopular speech. This Court should not adopt a rule that gives crowds the perverse incentive to set the parameters of public discussion through violence. That is an inversion of the fundamental First Amendment principles that the heckler's veto doctrine was designed to protect.

The heckler's veto doctrine also does not deprive the police of recourse in the face of a breach of the peace. The police may freely regulate speakers who engage in unprotected speech, like fighting words, incitement, and true threats. *See, e.g.*, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (fighting words); *Feiner v. New York*, 340 U.S. 315 (1951) (incitement); *Counterman v. Colorado*, 600 U.S. 66 (2023) (true threats). The police may regulate the time, place, and manner of protected speech on a content-neutral basis so long as they comply with intermediate scrutiny. *McCullen*, 573 U.S. at 477. The police may always arrest those who are engaged in violence—speakers and listeners alike—for "it is axiomatic that violent acts are not accorded protection under the first amendment." *Abernathy v. Conroy*,

429 F.2d 1170, 1176 (4th Cir. 1970). And if violent listeners are truly beyond the police's control, the police may give a dispersal order to everyone on the scene. *Bible Believers*, 805 F.3d at 253. But "the freedom to espouse sincerely held religious, political, or philosophical beliefs . . . . is too important to our democratic institution[s] for it to be abridged simply" because listeners have responded with violence. *Id.* at 252.

2. The district court misinterpreted *Kass*.

The district court did not cite any of these cases, much less try to distinguish them. Instead, it relied on exactly one published case—this Court's decision in *Kass*. SA40. But *Kass* does not support the district court's rule.

In *Kass*, the plaintiff brought a Fourth Amendment challenge to his disorderly conduct arrest for violating a police officer's order to move away from a confined group of protesters with whom he was speaking. 864 F.3d 200. Probable cause is a defense to a Fourth Amendment claim, and an officer is entitled to qualified immunity if "arguable" probable cause existed. *Id.* at 206. The officer contended that arguable probable cause existed under § 240.20(6) because the plaintiff failed to comply with his dispersal order. *Id.* at 211–213.

In evaluating that argument, the Court noted that the text of § 240.20(6) provides that the dispersal order at issue must be "lawful." *Id.* at 211. The Court also noted that the New York Court of Appeals has interpreted the word "lawful" to mean

34

that dispersal orders must be "calculated . . . to promote the public order" and not "purely arbitrary." *Id.* at 212 (quoting *People v. Todaro*, 26 N.Y.2d 325, 328–29 (1970)). Because the order in question meaningfully advanced "a legitimate public purpose"—*i.e.*, "to maintain crowd control and security"—the Court concluded that it met the "promote public order" / not "purely arbitrary" standard. *Id.*

Here, the district court interpreted this discussion to mean that the "promote public order" / not "purely arbitrary" standard was the applicable First Amendment standard. SA40. But that is not what *Kass* means. Instead, *Kass* was merely describing the New York Court of Appeals' *statutory interpretation of § 240.20(6)*, not this Court's interpretation of *the First Amendment*. *Id.* Indeed, *Kass* elsewhere considered whether the officer's order satisfied the applicable level of First Amendment scrutiny, which was intermediate scrutiny in that case because the order in question was content neutral. 864 F.3d at 207–09 and n.1.

*Kass* thus stands for the unremarkable proposition that, to serve as the predicate for probable cause (or arguable probable cause) under the Fourth Amendment, a dispersal order that regulates speech must satisfy *both* the statutory "promote public order" / not "purely arbitrary" standard *and* the applicable First Amendment standard. *Id.* Even if a dispersal order is "lawful" under New York law, it must still satisfy the First Amendment's more searching review. *Id.*

In this respect, *Kass* is just a routine application of settled First Amendment jurisprudence to § 240.20(6). Even if state action that restricts speech complies with state law, it must also satisfy First Amendment scrutiny. *See, e.g.*, *Cox*, 379 U.S. at 544–550 (reversing conviction for failing to comply with dispersal order that was valid under state law but violated the First Amendment); *Jones v. Parmley*, 465 F.3d 46, 60 (2d Cir. 2006) (noting that the facts would "give rise to a . . . First Amendment violation even if the [police] had a lawful basis [under state law] to" restrict speech); *Collins v. N.Y.C.*, 295 F. Supp. 3d 350, 367 (S.D.N.Y. 2018) (holding that courts must "consider[] whether officers' orders to disperse violated demonstrators' First Amendment rights before finding that . . . probable cause [exists]" (cleaned up)); *Akinnagbe v. N.Y.C.*, 128 F. Supp. 3d 539, 548 (E.D.N.Y. 2015) (holding that an order to disperse from "a political demonstration . . . . must be examined with the heightened scrutiny required by the First Amendment"). And as discussed, the appropriate First Amendment standard under the heckler's veto doctrine is strict scrutiny. *See* Section II.A., *supra,* at 26–30.

By adopting New York's statutory standard as the standard to govern Rusfeldt's constitutional claims, the district court effectively read the First

Amendment out of the Constitution. No Supreme Court or Second Circuit precedent permits that result.[7]

*     *     *

Contrary to the district court's conclusion, the heckler's veto doctrine is alive and well. Under it, the police engage in viewpoint discrimination as a matter of law when they regulate a speaker due to listeners' reaction to his speech, regardless of officers' subjective motivations.

## III. AS A MATTER OF LAW, THE HECKLER'S VETO DOCTRINE APPLIES HERE AND THE NYPD DID NOT SATISFY STRICT SCRUTINY

Because the district court rejected the heckler's veto doctrine, it never evaluated whether the doctrine applies here or whether the NYPD satisfied strict scrutiny. And the NYPD was so confident below that the heckler's veto doctrine did not exist that it did not dispute either (1) that officers ordered Rusfeldt to disperse due to the actions of the crowd or (2) that its actions failed to comply with strict

---

[7] In addition to *Kass*, the district court also cited this Court's unpublished decision in *Meyers v. City of New York*. SA40. Like *Kass*, however, *Meyers* simply notes that the "promote public order" / not "purely arbitrary" standard is the appropriate standard under the text of § 240.20(6). 812 F. App'x 11, 14 (2d Cir. Apr. 30, 2020) (summary order). And like *Kass*, *Meyers* also evaluated whether the order in question violated the First Amendment under the appropriate First Amendment standard. *Id.* at 15. *Meyers* and *Kass* thus hold the same thing—dispersal orders that regulate speech must satisfy both the state law standard and the appropriate First Amendment standard.

37

scrutiny. *See* Dkt. 109; Dkt. 169. The NYPD has therefore waived these arguments. *See Bogle–Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006). For this reason alone, Rusfeldt is entitled to judgment.

Even if the NYPD had preserved these arguments, they would fail. It is undisputed that the NYPD ordered Rusfeldt to disperse due to the crowd's reaction to his speech. Under the heckler's veto doctrine, those dispersal orders—and Rusfeldt's arrest for failing to comply with them—were thus viewpoint discriminatory as a matter of law. And on the undisputed facts, the NYPD cannot satisfy strict scrutiny.

### A. The NYPD ordered Rusfeldt to disperse "due to" the crowd's reaction to his speech.

The heckler's veto doctrine applies here. There is no dispute that the NYPD ordered Rusfeldt to disperse "due to" the crowd's reaction to his speech. *Bible Believers*, 805 F.3d at 248. Indeed, the NYPD admitted this fact below. The NYPD admitted that it ordered Rusfeldt to disperse because his speech had caused a "breach of the peace" and that its goal was "to separat[e] him . . . from [those] near-riot" conditions. Dkt. 109 at 2. The NYPD admitted that its goal "in . . . ordering [Rusfeldt] to disperse was . . . the restoration of public order" that the crowd had disturbed. *Id.* at 12; *see also* Dkt. 169 at 3 n.2, 5. And the NYPD admitted that it ordered Rusfeldt to disperse because "the situation had gone from being a peaceful afternoon to an active public safety hazard" based on the crowd's actions. Dkt. 169

at 4; *see also* Dkt. 108 at 7 (¶ 31), 8 (¶ 37), 15 (¶ 81), 20 (¶ 106). These admissions establish that the heckler's veto doctrine applies here.

Even if the NYPD had not admitted this fact, the undisputed facts establish that the NYPD ordered Rusfeldt to disperse "due to" to crowd's reaction to his speech. For one thing, the crowd gathered around Rusfeldt and began throwing bottles at him because of the words on his sign, among other things. *See* Video 1 at 3:40–16:29; Trial Tr. at 175–176, 200–201, 230; *see also* Dkt. 99-3 at 128–29; Dkt 99-4 at 18, 23, 34, 65–66; Dkt. 99-9 at 19–23. The crowd was thus reacting to Rusfeldt's speech. And for another thing, the NYPD ordered Rusfeldt to disperse based on the crowd's actions and not anything Rusfeldt himself did. Trial Tr. at 174–177, 184, 231–33, 229–230, 239; *see also* Dkt. 99-3 at 131–32, 156–57, 159, 172; Dkt. 99-4 at 68–70; Dkt. 99-9 at 23. Indeed, the district court acknowledged that the NYPD ordered Rusfeldt to disperse because the crowd was "blocking traffic," "throwing bottles," and otherwise threatening public disorder. SA36, 40. Under the heckler's veto doctrine, the NYPD thus engaged in viewpoint discrimination against Rusfeldt as a matter of law.

## B. The NYPD failed to satisfy strict scrutiny.

Because the NYPD engaged in viewpoint discrimination, strict scrutiny applies. *Playboy*, 529 U.S. at 817. And on the undisputed evidence, the NYPD cannot establish that its actions complied with strict scrutiny.

39

1. <u>The NYPD did not demonstrate that its interest in maintaining public order was compelling on the facts here.</u>

While maintaining public order obviously can be a compelling government interest in some situations, the NYPD did not demonstrate that interest was compelling on the facts here.

Take traffic control. Even assuming traffic control can be a compelling interest in some situations, *cf. Westchester Day Sch. v. Vill. of Mamaroneck*, 386 F.3d 183, 191 (2d Cir. 2004) (noting difficult with such a conclusion), it was not compelling here. Washington Square East was closed to through traffic, so the fact that the crowd was in that road had no impact on public order. Trial Tr. at 244; *see also* Dkt. 99-3 at 122–23. And while the crowd at times overflowed into West 4th Street, cars, ambulances, NYPD vehicles, FDNY vehicles, and even a large bus were able to drive down West 4th Street throughout the incident.[8] Considering the low volume of traffic during the incident, the public's expectation of delays in lower Manhattan on the day of the Pride Parade, and the fact that traffic could pass, the

---

[8] *See, e.g.*, Video 1 at 3:59; 5:23; 6:53; 8:46; 10:04; 11:20; 17:22; 18:32, 19:08, 19:31, 32:05, 32:30, 32:53, and 34:50; Video 2 at 2:06, 3:23, 3:42, 4:33, 4:36, 6:06, 6:11, 6:17, 6:20, 6:26, 6:29, 6:47, 9:09, 9:13, 9:21, 11:08, 12:23, 12:58, 13:57, 16:58, 18:12, 18:28, 18:58, 19:49, 19:59, 22:42, 24:12, 27:11, 27:20, 27:36, 28:45, 28:52, 28:54, 28:57, 29:07, 30:13, 32:04, 32:07, 33:13, 33:23, 34:52, and 36:30; Video 3 at 0:13, 1:46. 2:27, and 2:36.

minor inconvenience of "slowed traffic" was not a compelling government interest. *Jones*, 465 F.3d at 57.

Nor is there any evidence that the NYPD ever took any meaningful action to keep the crowd out of West 4th Street, like placing barricades there, stationing one of the many additional officers milling about the scene there, or warning people to stay out of the street. This "underinclusive" enforcement of the law confirms that the NYPD's interest in traffic control was "not really compelling." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011).

As for the crowd's threat to public safety, Rusfeldt does not dispute that the crowd presented a public safety threat by throwing bottles at him. But the problem for the NYPD is that the officers originally on the scene failed to intervene before that happened even though the incident was obviously headed in that direction. Officers could have—and should have—done more to protect Rusfeldt's speech *before* the crowd started throwing bottles, like putting up a "free speech barricade," calling for more officers, or warning the crowd that "physical assault[s against Rusfeldt] would result in the perpetrators' arrests." *Meinecke*, 99 F.4th at 525. Because the NYPD failed to take these basic steps to maintain order on the front end, they may not point to the crowd's disorder to justify their response. The police may not "sit idly on the sidelines—watching as the crowd imposes, through violence, a tyrannical majoritarian rule—only later to claim that [its actions were] necessary."

41

*Bible Believers*, 805 F.3d at 253; *see also Brown*, 564 U.S. at 802 (holding that regulatory underinclusivity undermines claim of compelling interest).

In any event, the crowd stopped throwing bottles when officers intervened. Accordingly, even if the NYPD could rely on the crowd's bottle-throwing to support its claim of a compelling interest, that public safety threat quickly passed. As Pounds admitted, the NYPD could have continued to "handle [the] crowd" without ordering Rusfeldt to disperse or arresting him. Trial Tr. at 180–81; *see also* Dkt. 99-9 at 41. In other words, any compelling interest that the NYPD had at the outset of the incident stopped once officers intervened. And the "speculative" possibility that the crowd might become violent again—despite the line of officers and barricades located between the crowd and Rusfeldt—is not a compelling interest sufficient "to warrant an infringement on the First Amendment." *Worrell Newspapers of Ind., Inc. v. Westhafer*, 739 F.2d 1219, 1225 (7th Cir. 1984), *aff'd* 469 U.S. 1200 (1985).

### 2. The NYPD did not demonstrate that its actions were necessary or that it took the least speech-restrictive means available to it.

The NYPD also failed to demonstrate that its actions were necessary or that it took the least restrictive means available to it. Rusfeldt has identified several "plausible, less restrictive alternatives" than ordering him to disperse and arresting him, and the NYPD failed to "prove [those] alternative[s would be] ineffective." *Playboy*, 529 U.S. at 823.

As both Pounds and Hughes admitted, the NYPD's goal was to diffuse the situation by getting Rusfeldt to take his speech elsewhere. Trial Tr. at 187, 233–24; *see also* Dkt. 99-3 at 131–32, 156–57, 159, 172; Dkt. 99-9 at 23. But the police may not "restrict a peaceful speaker as an easy alternative to dealing with a lawless crowd that is offended by what the speaker has to say." *Bible Believers*, 805 F.3d at 253. And given the overwhelming police force in the vicinity of the Park, moving Rusfeldt away from his intended audience was not necessary. Instead, the NYPD had other options available to it, like bringing in additional barricades or officers to create a larger separation between the crowd and Rusfeldt; ordering the crowd to step back, stay out of the street, and warning the crowd that violence would result in arrests; or ordering the crowd to disperse. Again, Pounds admitted that the NYPD could have continued to "handle [the] crowd." Trial Tr. at 180–81; *see also* Dkt. 99-9 at 41. On these facts, the NYPD was able to protect both Rusfeldt's speech and public safety. Ordering him to disperse—and arresting him for failing to comply—was neither necessary nor the least restrictive means the NYPD had available to it. *Meinecke*, 99 F.4th at 525; *Bible Believers*, 805 F.3d at 253.

Finally, even if the crowd had been beyond the NYPD's control, the NYPD still could have—and should have—given a general dispersal order to *everyone* on the scene, including the crowd and Rusfeldt. *Bible Believers*, 805 F.3d at 243 (noting that "[t]he police may . . . attempt to disperse the entire crowd if that becomes

43

necessary"). Hughes admitted that the NYPD's normal practice in response to an unlawful assembly is to issue a general dispersal order to everyone on the scene. Trial Tr. at 226; *see also* Dkt. 99-3 at 140. Yet the NYPD did not issue such an order here even though the Strategic Response Group—equipped with an LRAD and riot gear—was on standby a mere three blocks away. Trial Tr. at 237–38; *see also* Dkt. 99-3 at 172, 187, 214–216. As Hughes admitted, he was trying to diffuse the situation "without using [the] strategic response group." Trial Tr. at 237; *see also* Dkt. 99-3 at 214–26. Because the NYPD had means of addressing the threat to public safety posed by the crowd in ways that were less restrictive of Rusfeldt's speech, it did not satisfy strict scrutiny as a matter of law. *See Bible Believers*, 805 F.3d at 253.

## IV. RUSFELDT IS ENTITLED TO JUDGMENT ON ALL HIS CLAIMS

Because the NYPD violated heckler's veto doctrine as a matter of law, Rusfeldt's claims resolve themselves in his favor.

### A. First Amendment

Rusfeldt is entitled to judgment on his First Amendment claim under Rules 56 and 50. By ordering him to disperse due to the crowd's reaction to his speech and arresting him for failing to comply without satisfying strict scrutiny, the NYPD unconstitutionally restricted his speech. *See, e.g.*, *Meinecke*, 99 F.4th at 524–25; *Bible Believers*, 805 F.3d at 252–53; *Deferio*, 306 F. Supp. 3d at 512.

44

Moreover, contrary to the district court's conclusion, SA46, Rusfeldt may recover damages under his First Amendment claim arising from both his arrest and his decision to lower his sign and leave the original streetcorner where he was standing. *See* Video 3 at 0:03–4:11. Rusfeldt made that decision in response to the NYPD's threat to arrest him. *Id.* As this Court has held, an officer's order gives rise to a First Amendment claim for damages if the order "could reasonably be interpreted as intimating that some form of . . . adverse regulatory action [would] follow the failure to accede" to it. *Zieper v. Metzinger*, 474 F.3d 60, 65–66 (2d Cir. 2007); *see also Bible Believers*, 805 F.3d at 262 (remanding for damages calculation caused by plaintiff's compliance with unlawful dispersal order). The NYPD's order for Rusfeldt to disperse accompanied by the threat of arrest satisfies this requirement.[9]

According to the district court, an arrestee may not recover damages arising from the police's unlawful dispersal orders because the orders and arrest merge into "a single course of conduct." SA46. But the district court did not cite a single case in support of this conclusion, and it is wrong. It may make sense to merge Fourth Amendment false arrest claims with Fourth Amendment excessive force claims

---

[9] To be clear, while all the NYPD's dispersal orders to Rusfeldt violated the First Amendment, Rusfeldt seeks to recover damages arising from the dispersal order that was accompanied by a threat to arrest only. In response to that order, Rusfeldt lowered his sign and left the original streetcorner where he was standing.

where the allegedly excessive force was necessary to effect the arrest. *See, e.g.*, *Bashir v. Rockdale County*, 445 F.3d 1323, 1332 (11th Cir. 2006). But here, the NYPD's dispersal order accompanied by the threat to arrest was a "discrete constitutional violation," *id.*, separate from the arrest itself, giving rise to separate damages. Accordingly, Rusfeldt may recover damages under his First Amendment claim both for his arrest and for lowering his sign and leaving the original streetcorner where he was standing.

### B. Fourth Amendment

Rusfeldt is also entitled to judgment on his Fourth Amendment claim under Rules 56 and 50. The elements of a Fourth Amendment false arrest claim are "(1) the defendant," acting under color of state law, "intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Posr v. Doherty*, 944 F.2d 91, 96–97 (2d Cir. 1991). An arrest is privileged if supported by probable cause, and the defendant bears the burden of proving the existence of probable cause where, as here, the arrest is made without a warrant. *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010); *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003).

There is no dispute that Rusfeldt established the elements of his Fourth Amendment claim on which he bore the burden of proof. Moreover, the NYPD

cannot show that probable cause existed as a matter of law. As discussed, the NYPD's dispersal orders were unconstitutional under the heckler's veto doctrine. *See* Section III, *supra,* at 37–44. Rusfeldt's failure to comply with those orders thus cannot serve as the basis for probable cause under § 240.20(6) as a matter of law. A person "cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution." *Wright v. Georgia*, 373 U.S. 284, 291–92 (1963); *see also Friend*, 61 F.4th at 86–87 (holding that failure to comply with officer's unlawful dispersal order could not "create probable cause where there was none before").

Moreover, because Rusfeldt's alleged violation of any other statute the NYPD might invoke—including but not limited to NYPL § 240.20(7)—would be predicated on the crowd's reaction to his protected speech, no probable cause exists as a matter of law. *Provost v. City of Newburgh*, 262 F.3d 146, 159 (2d Cir. 2001) (holding that "constitutionally protected" activity may not give rise to probable cause as a matter of law); *Posr v. Ct. Officer Shield No. 207*, 180 F.3d 409, 416 (2d Cir. 1999) (similar). Rusfeldt is therefore entitled to judgment on his Fourth Amendment claim.[10]

---

[10] In addition, the district court correctly concluded at trial that probable cause cannot exist under § 240.20(7) because Rusfeldt's speech was a "legitimate purpose" under that statute's text. *See* Factual Background, *supra*, at 14 n.6.

## C. Free exercise

Rusfeldt is also entitled to judgment on his free exercise claim under Rule 56. Street preaching is protected by the Free Exercise Clause. *See Cantwell v. Connecticut*, 310 U.S. 296, 303–04 (1940); *Bible Believers*, 805 F.3d at 256. Restrictions on religious exercise that are not both neutral toward religion and generally applicable to religious and secular activity must comply with strict scrutiny. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532–46 (1993).

The district court acknowledged that "there was a religious component to Rusfeldt's speech." SA28. But it nevertheless granted summary judgment to the NYPD on Rusfeldt's free exercise claim, concluding that the NYPD's actions against him were neutral and generally applicable. *Id.*

That was error. Under the heckler's veto doctrine, the NYPD engaged in viewpoint discrimination against Rusfeldt as a matter of law. *See* Section III.A, *supra*, at 38–39. When the government engages in viewpoint discrimination against religious speech, its actions are neither neutral nor generally applicable. *See Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018) (noting that the Free Exercise Clause forbids "hostility to a . . . religious viewpoint"); *Bible Believers*, 805 F.3d at 256 (similar). Thus, strict scrutiny applies, which the NYPD

did not satisfy. *See* Section III.B, *supra,* at 39–44. Accordingly, Rusfeldt is entitled to judgment on his free exercise claim.

## V. *NIEVES* DOES NOT UNDERMINE RUSFELDT'S ENTITLEMENT TO JUDGMENT ON HIS FIRST AMENDMENT CLAIM

The district court also held that to prevail on his First Amendment claim, Rusfeldt was required, under *Nieves*, to prove either the absence of probable cause or that the *Nieves* exception applied. *See* SA18, 41. That holding was erroneous, but it does not alter the outcome. As discussed in the Fourth Amendment context, probable cause is lacking as a matter of law. *See* Section IV.B, *supra,* at 46–47. Because Rusfeldt has demonstrated the absence of probable cause, the Court need not decide whether *Nieves* applies to heckler's veto claims.

If the Court reaches the question, *Nieves* does not apply to heckler's veto claims. And even if *Nieves* applied, the undisputed facts satisfy the *Nieves* exception.

### A. *Nieves* does not apply to heckler's veto claims.

In *Nieves*, the Supreme Court held that plaintiffs bringing retaliatory arrest claims alleging that the arresting officer had a retaliatory animus against them based on their speech generally must plead and prove the absence of probable cause. 587 U.S. at 402. The Supreme Court grounded this holding on the "complex" causation problems inherent in determining whether the officer was subjectively motivated by a "retaliatory animus" against the arrestee. *Id.* at 398–401. Because the officer's

subjective motivations are crucial, the absence of probable cause "provide[s] weighty evidence that the officer's animus caused the arrest." *Id.* at 402.

But *Nieves* does not apply to retaliatory arrest claims where the arresting officer's subjective motivations are not at issue, like claims involving a governmental policy of retaliation. *Id.* (discussing *Lozman v. Riviera Beach*, 585 U.S. 87 (2018)). In these types of claims, causation is "straightforward," and the absence of probable cause does not have the same probity as when officers' subjective motivations matter. *Nieves*, 587 U.S. at 399; *see also Lozman*, 585 U.S. at 99–100; *Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012) (noting that probable cause only defeats First Amendment claims "premised on the allegation that defendants prosecuted a plaintiff out of a retaliatory motive").

Here, because the district court rejected the heckler's veto doctrine, it construed Rusfeldt's First Amendment claim as a retaliation claim and concluded that *Nieves* applied. *See* SA18, 41. But Rusfeldt asserts a heckler's veto claim, not a retaliation claim, and the district court erred by recharacterizing his claim as a retaliation claim. *Nieves* therefore does not apply.

Moreover, *Nieves*'s logic does not extend to heckler's veto claims. *Nieves* applies to retaliatory arrest claims where the arresting officer's subjective motivations matter because of the complex causation problems inherent in such claims. But under the heckler's veto doctrine, officers' subjective motivations are

irrelevant. *See* Section II.B, *supra,* at 30–37. For this reason, causation in heckler's veto claims is "straightforward," rendering *Nieves* inapplicable. *Nieves*, 587 U.S. at 399. No court—other than the district court here—has ever held that *Nieves* applies to heckler's veto claims. And this Court has concluded that plaintiffs may state a First Amendment claim not based on the arresting officer's retaliatory animus without considering whether the plaintiff alleged the absence of probable cause. *Friend*, 61 F.4th at 91–93; *see also Case v. N.Y.C.*, 233 F. Supp. 3d 372, 391 (S.D.N.Y. 2017) (same).

To be sure, whether probable cause exists can be *relevant* to a heckler's veto claim, at least where the police assert that they took regulatory action against the speaker based on probable cause that is independent from listeners' reaction to his speech. If, for example, Rusfeldt had become violent and the NYPD contended that it ordered him to disperse based on his own violent acts, whether probable cause existed to believe that Rusfeldt had engaged in violence would be relevant. But this does not mean that Rusfeldt must prove the absence of probable cause. Instead, the question would go to the jury to determine whether the NYPD ordered him to disperse due to his own violent acts—in which case the heckler's veto doctrine would not apply—or due to the crowd's reaction to his speech—in which case it would.

Here, however, the evidence and the NYPD's admissions establish that officers ordered Rusfeldt to disperse due to the crowd's reaction to his speech and not any independent unlawful action he took. *See* Section III.A, *supra,* at 38–39. Accordingly, the heckler's veto doctrine applies. And because the NYPD violated that doctrine as a matter of law, Rusfeldt is entitled to judgment on his First Amendment claim.

### B. Even if *Nieves* applied to heckler's veto claims, Rusfeldt has established the *Nieves* exception.

Even if *Nieves* applied to heckler's veto claims, Rusfeldt would be entitled to judgment on his First Amendment claim under the *Nieves* exception. That exception applies when the police arrest the plaintiff without taking regulatory action against "individuals [engaging in similar acts] at the same time [the plaintiff was]." *Ballentine v. Tucker*, 28 F.4th 54, 62 (9th Cir. 2022); *see also Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024).

The individuals in the crowd that gathered around Rusfeldt were similarly situated to him for *Nieves* purposes. Those individuals were spilling over into West 4th Street, throwing bottles, and otherwise threatening public safety, all of which served as the basis for the NYPD's dispersal orders to Rusfeldt. *See* Section III.A, *supra,* at 38–39. Yet the NYPD took regulatory action against Rusfeldt alone. On these facts, the *Nieves* exception applies as a matter of law. *Ballentine*, 28 F.4th at 62.

In rejecting this conclusion, the district court focused on specific individuals in the crowd and concluded that Rusfeldt was not similarly situated to them. For example, the district court concluded that Rusfeldt was not similarly situated to the bottle-throwers because the NYPD could not tell who they were. SA41. But even if the NYPD was unable to *arrest* the bottle-throwers, nothing prevented the NYPD from ordering the entire crowd to *disperse*, which would have included the bottle-throwers. Moreover, other individuals in the crowd who were engaging in the unlawful acts the NYPD used as a predicate for ordering Rusfeldt to disperse—blocking traffic and otherwise creating a threat to public safety—were identifiable. Yet the NYPD failed to order these individuals to disperse despite ordering Rusfeldt to do so.

The district court also concluded that Rusfeldt was differently situated from other individuals in the crowd because they were "participants in a parade or event for which a permit" was required. SA41. But as discussed, no permit covered the location where Rusfeldt was standing. *See* Factual Background, *supra*, at 10 and n.3. Accordingly, Rusfeldt was similarly situated to the individuals in the crowd.

## VI. DISTRICT COURT ERRED BY FAILING TO GRANT RUSFELDT A NEW TRIAL

In the alternative, the district court erred by failing to grant Rusfeldt a new trial. A new trial is appropriate if "the jury instructions gave a misleading impression or inadequate understanding of the law." *Plagianos v. Am. Airlines, Inc.*, 912 F.2d

57, 59 (2d Cir. 1990); *see also Ashley v. N.Y.C.*, 992 F.3d 128, 143 (2d Cir. 2021)

(similar). The jury charge was erroneous and prejudicial for four reasons.

### A. The charge erroneously failed to instruct the jury on the heckler's veto doctrine.

First, the charge failed to instruct the jury on the heckler's veto doctrine—*i.e.*,

that taking regulatory action against a speaker due to listeners' reaction to his speech

constitutes viewpoint discrimination as a matter of law, regardless of officers'

subjective motivations. Instead, the charge stated that "[a]n order to disperse is

lawful if its purpose is to promote public order and [it] was not . . . purely arbitrary

. . . . An order that is motivated by an intent to suppress or discriminate against a

particular viewpoint is not [lawful]." Trial Tr. at 375:13–16. As discussed, while this

charge was not an incorrect statement of New York law interpreting § 240.20(6), it

gave the jury an incomplete and misleading understanding of the First Amendment.

*See* Section II.B.2, *supra,* at 34–37. The district court should have given Rusfeldt's

proposed instruction instead. *See* Dkt. 125 at 13–14.

This error was also highly prejudicial. To prevail, Rusfeldt was required to

show only that the NYPD ordered him to disperse "due to" the crowd's reaction to

his speech, not that officers had the subjective intent to suppress or discriminate

against his viewpoint. *See* Section II, *supra,* at 26–37. Yet the jury was never

presented with that question. Rusfeldt is thus entitled to a new trial, at least.

### B. The charge incorrectly stated that Rusfeldt was required to prove that NYPD officers had a retaliatory animus against him.

Second, the charge on Rusfeldt's First Amendment claim instructed the jury that to find for him the NYPD must have "retaliate[d]" against him. Trial Tr. at 370, 377–79. As discussed, however, Rusfeldt's First Amendment claim was not a retaliation claim but a heckler's veto claim. *See* Section V.A, *supra*, at 49–52. And unlike retaliation claims, heckler's veto claims do not require proof of a retaliatory animus. *Id.* The charge was thus erroneous. Rather than require Rusfeldt to prove that the NYPD retaliated against him, the district court should have given Rusfeldt's proposed instruction on his First Amendment claim, which did not require him to prove that officers had a retaliatory animus against him. Dkt. 125 at 13–14.

This error was also highly prejudicial. To "retaliate" means "to return like for like—especially: to get revenge." MERRIAM-WEBSTER ONLINE DICTIONARY, *Retaliate*, available online at https://www.merriam-webster.com/dictionary/retaliate (last visited Feb. 23, 2026); BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "retaliate" as "the act of doing someone harm in return for actual or perceived injuries or wrongs"). Case law confirms this meaning. *See United States v. Age*, 136 F.4th 193, 248 (5th Cir. 2025) (noting that "retaliation" means "to get revenge"); *Myers v. Richland Cnty.*, 429 F.3d 740, 751 (8th Cir. 2005) (same). The charge thus gave the jury the misimpression that Rusfeldt must prove that officers had a desire to get revenge against him based on the content of his speech. Because Rusfeldt was

not required to prove that any NYPD officer had a retaliatory animus against him, he is at least entitled to a new trial.

### C. The charge incorrectly stated that Rusfeldt was required to prove the absence of probable cause or that the *Nieves* exception applied.

Third, the jury charge on Rusfeldt's First Amendment claim stated that he must prove either the absence of probable cause or that the *Nieves* exception applied. *See* Trial Tr. at 377:7–13. As discussed, however, First Amendment heckler's veto claims are not subject to *Nieves*. *See* Section V.A, *supra*, at 49–52. The charge was therefore erroneous. Yet again, the district court should have used the framework set forth in Rusfeldt's proposed instruction. Dkt. 125 at 13–14. Moreover, the charge was prejudicial—Rusfeldt was not required to prove either the absence of probable cause or that the *Nieves* exception applies to prevail on his First Amendment claim. Instead, proving that the NYPD violated the hecklers' veto doctrine is enough. *See* Section V.A, *supra*, at 49–52. Accordingly, Rusfeldt is entitled to a new trial, at least.

### D. The charge incorrectly limited Rusfeldt's First Amendment claim to his arrest.

Fourth, the jury charge on Rusfeldt's First Amendment claim instructed the jury that this claim was limited to his arrest. Trial Tr. at 377:5–6. As discussed, however, Rusfeldt also sought damages associated with lowering his sign and leaving the streetcorner in response to the dispersal order that was accompanied by

56

a threat to arrest. *See* Section IV.A, *supra,* at 44–46. The district court should have given Rusfeldt's proposed instruction. Dkt. 125 at 13–14. Its failure to do so prejudiced Rusfeldt, warranting a new trial at least.

## **CONCLUSION**

The Court should REVERSE the judgment and REMAND for further proceedings. In the alternative, the Court should VACATE and REMAND for a new Phase 1 trial.

February 23, 2026

Respectfully submitted,

*/s/ Josh Dixon*
Josh Dixon
Center for American Liberty
2145 14th Avenue, Suite 8
Vero Beach, FL 32960
(703) 687-6212
jdixon@libertycenter.org

*Attorney for Plaintiff-Appellant*
*Pastor Aden Rusfeldt*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) and LR 32.1(a)(4)(A) because this brief contains 13,806 words, excluding the parts exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Office 365.

This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman.

Respectfully submitted,

*/s/ Josh Dixon*
Josh Dixon
*Attorney for Plaintiff-Appellant*

# <u>SPECIAL APPENDIX</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
PASTOR ADEN RUSFELDT,

                          Plaintiff,                              22-cv-594 (PKC)


             -against-                                   OPINION AND ORDER

CITY OF NEW YORK, NEW YORK;
KEECHANT SEWELL, in her Official
Capacity as Commissioner of the City of New
York Police Department; and STEPHEN
HUGHES, in his Individual Capacity,

                          Defendants.
------------------------------------------------------------x

CASTEL, U.S.D.J.

            Pastor Aden Rusfeldt brings claims arising from his interactions with and arrest

by officers of the New York City Police Department ("NYPD") that occurred while he was

holding up a large sign on a long pole reading "Fags and Whores Burn in Hell" at the June 27,

2021 PrideFest in Manhattan.  He asserts violations of his First Amendment right to free speech,

First Amendment right to free exercise of religion, Fourth Amendment protection against

unreasonable seizure, and his Fourteenth Amendment rights to equal protection and due process

against the City of New York, the Commissioner of the NYPD in his or her official capacity, and

Stephen Hughes in his individual capacity.  Rusfeldt and the defendants have filed cross-motions

for summary judgment on Rusfeldt's claims for constitutional injuries.

            The First Amendment protects Rusfeldt's right to express his message and the

Pride festivalgoers' right to express their hostility to his message.  The expressive elements of

Rusfeldt's hateful message and the festivalgoers' expressed antipathy to the message do not

require law enforcement to turn a blind eye to the potential that the physical proximity of the two

SA1

groups could lead to unlawful behavior. But the permissible means to mitigate the potential for escalation cannot be the removal of a person engaging in protected speech merely to appease others offended by his expressive activity. Provocations to immediate violence may change the calculus.

When police officers learned that objects and liquids had been thrown by members of the crowd of Pride festivalgoers in the direction of Rusfeldt, they stepped into action. They could have ordered the crowd dispersed or arrested an offender, if the person was observed and could be identified and apprehended. Police officers selected a different response, at first standing in between Rusfeldt's group and the crowd and then moving metal barriers into place between the two groups, which did not impair the ability of Rusfeldt or the festivalgoers to deliver their messages.

Law enforcement also had concerns that Rusfeldt was on the sidewalk with a long pole holding his message aloft, potentially blocking the sidewalk and presenting a hazard to others. Police officers told Rusfeldt to move—or, as defendants now characterize it, ordered him to disperse. Rusfeldt was ultimately arrested. The "Complaint/Information" for the violation of at least one of New York's disorderly conduct provisions (N.Y. Penal Law § 240.20(7)), which was affirmed by the officer on the date of the arrest, noted that Rusfeldt was "in possession of a large metal pole. Defendant was asked to relinquish the pole and refused to do so." (ECF 99-11 at 4.) The charges were later dismissed without any court appearance.

The lawfulness of Rusfeldt's arrest does not turn on whether the individual officers loved or hated his message but on whether they had probable cause to arrest him and whether they would have arrested another person with a very different message under similar circumstances.

2

SA2

The fog of police action on June 27, 2021 is not sufficiently clarified by snippets of video, augmented by deposition testimony.  Material issues of fact abound that preclude this Court from definitively opining on the lawfulness of police conduct.  The Court will grant the defendants' summary judgment motion dismissing the Free Exercise claim (Second Claim) and Equal Protection claim (Fourth Claim).  It will deny each side's summary judgment motion directed to the Due Process claim (Fifth Claim) without prejudice to renewal of each side's positions at trial.  Material issues of fact preclude Hughes's qualified immunity claim at this juncture.  Rusfeldt does not oppose the dismissal of the police commissioner, who is sued only in an official capacity.  All other relief sought by either party will be denied.

BACKGROUND

For each side's motion for summary judgment, the Court construes the facts in a light most favorable to the non-movant.  Many of the core facts are undisputed and the Court notes material disputes where they exist.[1]

Rusfeldt is a self-described Christian evangelist and the pastor of a church located in Philadelphia.  (Pl. 56.1 (ECF 101) ¶ 1; Def. 56.1 Resp. (ECF 108) ¶ 1.)  Rusfeldt regularly engages in street preaching in which he denounces "LGBTQ+ ways of life"; he asserts that he has a religious obligation to express this viewpoint, despite knowing that many people will take offense at the content of his preaching.  (Pl. 56.1 ¶¶ 4-5; Def 56.1 Resp. ¶ 4.)  Rusfeldt refers to this practice as "Confrontational Evangelism."  (Def. 56.1 ¶ 100; Pl. 56.1 Resp. (ECF 114) ¶ 100.)

---

[1] Citations to the parties' Rule 56.1 statements are intended to reflect the evidence cited in those statements.

3

On June 27, 2021, Rusfeldt attended PrideFest, a large street festival held in downtown Manhattan that celebrates the LGBTQ+ community. (Pl. 56.1 ¶¶ 6, 8; Def 56.1 Resp. ¶¶ 6, 8.) Rusfeldt asserts that he was motivated by his religious beliefs to attend PrideFest because it was an "ideal opportunity to protest and proselytize." (Pl. 56.1 ¶ 7.) Rusfeldt, his wife, and two other members of his church arrived in what they describe as "a central gathering place for PrideFest attendees," i.e., Washington Square Park, on the afternoon of June 27. (Pl. 56.1 ¶¶ 8-9; Def 56.1 Resp. ¶¶ 8-9.)

The following sequence of events was recorded on video by Rusfeldt's wife, Mary. The authenticity of the video is not disputed by the parties, though there are three distinct segments of video. (Pl. 56.1 ¶¶ 10, 15; Def. 56.1 Resp. ¶¶ 10, 15.) Rusfeldt asserts that he wanted to ensure his interactions with festivalgoers and police were recorded, based on his past experience with street preaching and his expectation that some attendees would disagree with his message and "might become hostile." (Pl. 56.1 ¶¶ 10-13, 15; Def. 56.1 Resp. ¶¶ 10-13, 15.) When Rusfeldt and his wife and companions arrived at Washington Square Park, there was a "festival environment" in the air, and many festivalgoers were playing music and wearing Pride-related attire and flags; some streets were blocked to vehicular traffic by metal barricades. (Pl. 56.1 ¶¶ 17-19; Def. 56.1 Resp. ¶¶ 17-19.)

Rusfeldt and his companions stationed themselves on a street corner across from the Park and set up a sign with messages on it, and also removed their outer layers of clothing to reveal messages on their shirts. (Pl. 56.1 ¶¶ 23-25.) (See Video Part 1 (ECF 99-5) at 0:18-27.) These "religious messages" were, among other things, "critical of LGBTQ+ ways of life." (Pl. 56.1 ¶ 25; Def. 56.1 Resp. ¶ 25.) The video shows that Rusfeldt's group was carrying a large banner on a metal pole that read, "Fags and Whores Burn in Hell." (See Video Part 1 at 2:24;

4

ECF 99-10 at 1:14; see also ECF 47 at 3.)  The group's T-shirts also displayed messages critical of feminism.  (See, e.g., Video Part 1 at 2:22.)

Rusfeldt's companion then began to preach in a way that was also critical of LGBTQ+ ways of life.  (Pl. 56.1 ¶ 26; Def. 56.1 Resp. ¶ 26.)  The video captures the speech, which includes Rusfeldt's companion telling bystanders that they were "sick," "disgusting," and "going to hell."  (Video Part 1 at 4:30-35.)  Rusfeldt's companion used a bullhorn as he spoke. (Id. at 3:45.)

As Rusfeldt's companion preached, five NYPD officers were standing immediately across the street, observing Rusfeldt and his group.  (Pl. 56.1 ¶ 28; Def. 56.1 Resp. ¶ 28; Video Part 1 at 5:00, 13:15.)  As Rusfeldt's group continued to speak, a crowd formed around them, quickly growing to approximately 200 people.  (Pl. 56.1 ¶¶ 29-30; Def. 56.1 Resp. ¶¶ 29-30.)

The parties agree that the crowd "heckled, berated, and threatened" Rusfeldt and his group due to the content of and viewpoint expressed in their speech.  (Pl. 56.1 ¶ 31; Def. 56.1 Resp. ¶ 31.)  Defendants deny knowledge of the motivations of any individual member of the crowd and suggest that the crowd may also have been attracted by the police presence, but they accept that the crowd was hostile to the viewpoints expressed.  (Def. 56.1 Resp. ¶ 32; Pl. 56.1 ¶ 32.)  The crowd danced in front of Rusfeldt's group, cursed at them, made offensive gestures at them, and took pictures in front of them.  At least one protestor attempted to engage Rusfeldt in a debate about the Bible.  (Video Part 1 at 7:59-8:15.)  At one point, another protestor approached Rusfeldt's group and stated that, although he did not agree with Rusfeldt's message, he did approve of Rusfeldt staying there and exercising his right to free speech.  (Id. at 20:19-31.)  For at least 15 minutes, the NYPD officers located across the street from Rusfeldt's group continued

5

to stand across the street but did not take any action to control the crowd.  (Pl. 56.1 ¶ 35; Def. 56.1 Resp. ¶ 35; <u>see</u> Video Part 1 at 5:00, 13:15.)

After about 15 minutes, some of the crowd began to throw objects and liquids at Rusfeldt's group.  (Pl. 56.1 ¶ 36; Def. 56.1 Resp. ¶ 36; <u>see</u> Video Part 1 at 15:34, 15:58-16:05, 19:20.)  At this point, the NYPD officers who had been observing the scene pushed their way through the crowd to speak with Rusfeldt.  (Pl. 56.1 ¶ 37; Def. 56.1 Resp. ¶ 37; <u>see</u> Video Part 1 at 16:30.)

One of the officers, Officer Nicholas Pounds, told Rusfeldt to "shut it down" and directed him to move around the corner.  (Pl. 56.1 ¶ 38; Def. 56.1 Resp. ¶ 38.)  The video shows Pounds saying to Rusfeldt, "All right, shut it down.  Someone's gonna get hurt, so shut it down." (Video Part 1 at 16:50-52.)  Rusfeldt declined to move or to lower his sign, citing his First Amendment right to protest peacefully, and requested to speak with a higher-ranking member of the NYPD.  (Pl. 56.1 ¶ 40; Def. 56.1 Resp. ¶ 40; Video Part 1 at 17:15.)  Pounds replied, "I get it, I get it, but if there's a risk of somebody getting hurt, we gotta shut it down."  (Video Part 1 at 16:50-58.)  Another officer stated that the crowd was blocking the street.  (<u>Id.</u> at 17:00-03.) When Rusfeldt requested to speak to a lieutenant or sergeant, Pounds again said to Rusfeldt, "Shut it down.  And we'll go over there and we're gonna talk to you."  (<u>Id.</u> at 17:08-20.)  Pounds then continued, when Rusfeldt said he was not blocking the sidewalk, "It's not about blocking the sidewalk, it's about creating a dangerous situation."  (<u>Id.</u> at 17:30-34.)  Rusfeldt showed Pounds letters that he or his attorney had purportedly sent to a captain in that district, informing him of his plans to preach on that sidewalk in accordance with his First Amendment rights; Pounds replied, "I get it, I get it."  (<u>Id.</u> at 18:31-33.)

The NYPD officers contacted their superiors while standing between Rusfeldt and the crowd.  (Pl. 56.1 ¶ 41; Def. 56.1 Resp. ¶ 41.)  Sergeant Sean McDermott of the NYPD arrived about ten minutes later and informed Rusfeldt that the NYPD had "more resources" on the way.  (Pl. 56.1 ¶¶ 43-44; Def. 56.1 Resp. ¶¶ 43-44; Video Part 1 at 22:30-23:57.)  Rusfeldt explained to Sergeant McDermott that he planned to stay on the sidewalk and exercise his First Amendment rights and that he would not block the sidewalk, and McDermott replied, "That's fine."  (Video Part 1 at 22:57.)

As the crowd of Pride attendees continued to protest, one protestor waved, in the face of Rusfeldt and the police officers, rainbow streamers on a large wooden or metal pole; the officers did not take any action.  (Id. at 28:39-29:20.)  NYPD Captain Mark Turner then arrived.  (Id. at 31:32.)  When Rusfeldt asserted to Turner that his speech was protected by the First Amendment, Captain Turner replied that he was not going to "put [his] officers at risk for expression."  (Pl. 56.1 ¶ 49; Def. 56.1 Resp. ¶ 49; Video Part 1 at 32:38-40.)  Turner asked Rusfeldt repeatedly to leave the area; when Rusfeldt stated that he was expressing his First Amendment rights, Turner stated, "This is not the time or place."  (Video Part 1 at 31:53.)  He also pointed to the sign and said, although the audio is not perfectly audible, "That sign is—no."  (Id. at 32:16.)  Rusfeldt also stated that he planned to stay until dark to continue preaching.  (Id. at 32:50-54.)  When Turner stated there was a danger to his officers, Rusfeldt replied that the officers could leave and put up barricades between him and the crowd.  (Id. at 32:40-45.)

When asked again by Turner if he would leave, Rusfeldt stated that he was respectfully declining based on his First Amendment rights.  (Id. at 33:34-40; Pl. 56.1 ¶¶ 47-48; Def. 56.1 Resp. ¶¶ 47-48.)  NYPD then placed portable metal barricades between Rusfeldt and

SA7

the group, as well as stationing additional officers between them.  (Pl. 56.1 ¶ 45; Def. 56.1 Resp.

¶ 45; Video Part 2 (ECF 99-7) at 5:16-34.)

        Turner then stated that he had talked to his "legal agents" and asked Rusfeldt and

his group to move again, stating that they were causing an emergency situation; Turner said that

if Rusfeldt did not move, he would get "[his] cops" to move them.  (Video Part 2 at 13:40-53.)

Rusfeldt asked if he was under arrest and stated, "All my attorney needs is the word 'arrest.'"

(Id. at 14:06-10.)  Another officer replied that Rusfeldt was not under arrest "right now" and was

free to go, that he could still "protest," but just had to move somewhere else.  (Id. at 14:12-20.)

Turner then accused Rusfeldt of causing a "ruckus" and said repeatedly, "It's you, it's you."  (Id.

at 14:39-44.)  When Rusfeldt continued not to move and to ask about arrest, Turner said he

would have his officers remove Rusfeldt, stating, "It's you that they're going to remove."  (Id. at

15:15-18.)  Rusfeldt said to one of his companions a few minutes later, "We might have to move

a little bit, but it's all the same."  (Id. at 16:16-18.)  Several minutes later, Rusfeldt and his group

displayed a new sign written with a Sharpie that one of his companions held up over his head;

that sign was not displayed on a pole.  (Id. at 22:40-23:18.)

        NYPD Legal Bureau officers had, by this point, arrived on the scene and are

visible in the video speaking to other NYPD personnel.  (Id. at 25:50.)  Rusfeldt noted this,

pointing out to his wife that the NYPD was "having a meeting over there" and that the NYPD

was aware "we're not doing anything wrong."  (Id. at 29:22-36.)

        Finally, another officer approached Rusfeldt's group and said, "You're being

ordered to disperse from this corner," told them to gather their belongings, and stated that if they

did not move from the corner, they would be arrested.  (Video Part 3 (ECF 99-8) at 0:01-15.)  At

**SA8**

this point, Assistant Chief Stephen Hughes arrived on the scene as well.  (Pl. 56.1 ¶ 50; Def. 56.1 Resp. ¶ 50.)

Hughes said to Rusfeldt, "Take the sign down."  (Video Part 3 at 1:07.)  Rusfeldt asked, "Is it illegal?"  (Id. at 1:09.)  Hughes replied, "Listen.  Take the sign down."  (Id. at 1:11.)  Another officer added, "It's causing a problem."  (Id. at 1:20-24.)  Then, an officer who appeared to be from the NYPD Legal Bureau stepped forward and advised Rusfeldt that he could take the sign off the pole and continue to hold and display it, noting that "nobody's saying you can't hold the sign," but that walking around with the pole was causing a dangerous condition.  (Id. at 1:33-2:00.)  The Legal Bureau officer asked Rusfeldt just to collapse the metal pole and said, "It's not . . . the speech," pointing to the sign itself.  (Id. at 2:00.)  Rusfeldt agreed to collapse the foldable metal pole and started to do so.  (Id. at 2:00-30.)

Rusfeldt then said to his group, "It looks like the crowd's that way.  To go away from the crowd, we can go that way," and began to walk along the street, away from the crowd that had gathered on the street corner toward the comparatively emptier Washington Place.  (Id. at 2:35-38.)  Hughes told them to walk toward Broadway and to make a right at the next corner.  (Id. at 3:00-11.)  As they walked away, guided by NYPD officers, Hughes said to another officer, "Call me if he puts up the sign again and creates a disturbance."  (Id. at 3:18.)  After calling out to the officers that, if any officer arrested him, the officer would get a "permanent mark" on their record for violating his civil rights, Rusfeldt stopped a little more than halfway down the street.  (Id. at 4:00-10.)  Around this time, Officer Pounds's body-worn camera began to capture the events as well.  (ECF 99-10.)  An officer took out handcuffs at one point, saying, "We gave you a chance, bro, turn around," but then, instead of arresting Rusfeldt or taking his sign, continued to instruct him and his group to walk.  (Video Part 3 at 6:09-30; ECF 99-10 at

9

SA9

2:53-3:15.)  Eventually, Rusfeldt and his group reached the corner of Washington Place and

stepped off the main road.  (Video Part 3 at 7:00; ECF 99-10 at 3:40.)

Once they were on Washington Place, Hughes said to Rusfeldt, "You're

antagonizing these people," and told him that the crowd would attack him and that Hughes's

officers, who had families of their own, would get hurt in protecting him, which the NYPD was

"unfortunately" required to do.  (Video Part 3 at 7:15; ECF 99-10 at 3:45; Pl. 56.1 ¶ 59; Def.

56.1 Resp. ¶ 59.)  Rusfeldt replied, "Unfortunately?  That's a good law."  (ECF 99-10 at 3:50.)

Hughes said, "Listen, we gave you an opportunity to leave before, I'm not giving it to you

again."  (Video Part 3 at 7:28-31; ECF 99-10 at 4:15.)  As Rusfeldt continued to speak with

Hughes, stating that he was just "walking down the street," Hughes turned to Rusfeldt's wife,

who was still filming, and said, "Look at the sign.  Show his sign.  Aim [the camera] up at the

sign."  (Video Part 3 at 7:40-44; ECF 99-10 at 4:21-29.)  Notably, the metal pole holding up the

sign had been at least partially collapsed at this point, although Rusfeldt was still holding it up.

(Video Part 3 at 7:44; ECF 99-10 at 3:56.)  Hughes then asserted that under New York law, he

had the ability to order a "group of three or more" to disperse.  (Video Part 3 at 8:07-15.)

Hughes also ordered Pounds to film the crowd in order to document the dangerous condition of

the hostile crowd, which is documented in Pounds's body-worn camera footage.  (Pl. 56.1 ¶¶ 60-

61; Def 56.1 Resp. ¶¶ 60-61; ECF 99-10 at 5:50-6:30.)

As Pounds filmed the crowd, Hughes stated to him and another officer: "Tell

them to disperse again so they have it . . . . Tell them to disperse.  Don't say anything else.  Just

disperse."  (ECF 99-10 at 6:28-37.)  The other officer stepped forward and said to Rusfeldt's

group: "One last chance.  You're ordered to disperse."  Pounds then added, "Please disperse,

leave the area, please.  Please leave the area."  (Video Part 3 at 9:54-10:03; ECF 99-10 at 6:41-

47.)  The officers then arrested Rusfeldt and his companions.  (Video Part 3 at 10:10-30; ECF 99-10 at 7:00-30.)  The crowd cheered when Rusfeldt was arrested.  (Video Part 3 at 10:10-30; Pl. 56.1 ¶ 66; Def. 56.1 Resp. ¶ 66.)  Rusfeldt handed the sign to one of his companions as he was arrested; the companion began disassembling the sign, but officers instructed him to put the sign down so they could arrest him.  The companion replied, "I'm taking [the sign] down for you guys. . . . Wait, I'm arrested for complying? . . . I am leaving."  (Video Part 3 at 10:22-33; ECF 99-10 at 7:07-18.)  Another officer instructed the companion, "Take the sign apart right now and leave the area," but shortly thereafter, all three of Rusfeldt's companions were arrested.  (Video Part 3 at 10:45-11:20; ECF 99-10 at 7:32-7:48.)

Rusfeldt was transported to a booking facility after his arrest, where he was held in custody for approximately two and a half hours before he was released.  (Def. 56.1 ¶ 101; Pl. 56.1 Resp. ¶ 101.)  Rusfeldt was issued summonses for Disorderly Conduct under N.Y. Penal Law § 240.2(6) & (7).  (Def. 56.1 ¶ 102; Pl. 56.1 Resp. ¶ 102.)  See also N.Y. Penal Law § 240.2(6) & (7) ("A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . 6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or 7. He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose.").  Those summonses were eventually dismissed against Rusfeldt and his companions.  (Def. 56.1 ¶ 102; Pl. 56.1 Resp. ¶ 102.)

It is undisputed that no members of the crowd of Pride attendees were arrested, that no NYPD officer used a bullhorn to give a dispersal order during the event, and that the NYPD did not direct any law enforcement resources toward dispersing the crowd of Pride attendees, although dozens of officers were present on the scene, other than some officers telling

11

individuals to "move along" occasionally.  (Pl. 56.1 ¶¶ 77-79; Def. 56.1 Resp. ¶¶ 77-79.)

Defendants do not dispute that they had dozens of officers on scene throughout the incident but

assert that they did assist in dispersing the crowd "insofar as they participated in the arrest and

removal of Plaintiff and his group, who were recklessly causing the crowd to form and remain."

(Def. 56.1 Resp. ¶ 80.)

　　　　Rusfeldt also attended the Pride March in New York in 2022 and 2023,

communicated his intention to do so to the City's counsel in advance, and was not arrested at

those events.  (Pl. 56.1 ¶¶ 82-83; Def. 56.1 Resp. ¶¶ 82-83.)  Rusfeldt states that he plans to

attend future Pride events to continue his preaching and that he reasonably fears that the City will

again stop him from speaking and arrest him.  (Pl. 56.1 ¶¶ 85-87.)


PROCEDURAL HISTORY

　　　　Rusfeldt filed his complaint on January 21, 2022.  (ECF 1.)  On March 7, 2022,

Rusfeldt moved for a preliminary injunction, seeking to enjoin defendants from preventing him

from engaging in speech criticizing LGBTQ+ ways of life during the 2022 Pride March.  (ECF

17.)  After granting several requests to extend time to respond to this motion, the Court held a

hearing and denied Rusfeldt's motion for a preliminary injunction, concluding that Rusfeldt had

not demonstrated a likelihood of irreparable harm; the Court did not reach the issue of his

likelihood of success on the merits.  (ECF 47 at 7.)  The Court also denied Rusfeldt's June 24,

2022 letter seeking reconsideration of that decision.  (ECF 45, 48.)

　　　　On March 20, 2023, Rusfeldt submitted his First Amended Complaint (ECF 83).

Rusfeldt also served a notice of Constitutional Question pursuant to Rule 5.1, Fed. R. Civ. P.,

and Request for Certification pursuant to 28 U.S.C. § 2403 on the New York State Attorney

General.  (ECF 87.)  The Court certified this challenge to the New York State Attorney General and also extended the time for the Attorney General to intervene.  (ECF 96.)  The Attorney General's office then informed the Court that it did not elect to intervene at that time, requesting that no adverse inference be drawn to the State from that decision.  (ECF 97.)

Rusfeldt thereafter moved for summary judgment.  (ECF 98.)  Defendants cross-moved for summary judgment on December 21, 2023.  (ECF 107.)[2]


LEGAL STANDARD

On a motion for summary judgment, the movant must show "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  In the case where both parties have moved for summary judgment, "a court need not enter judgment for either party.  Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Morales v. Quintel Entertainment, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citations omitted).  "Even where both parties have moved for summary judgment, 'neither motion may be granted unless one party is entitled to it as a matter of law upon genuinely undisputed facts.'"  Safeway Environmental Corporation v. American Safety Insurance Company, 2010 WL 331693, at *2 (S.D.N.Y. Jan. 28, 2010) (Pauley, J.) (quoting Rhoads v. McFerran, 517 F.2d 66, 67–68 (2d Cir. 1975) (per curiam)) (citations omitted).  "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  Williams v. New York City Housing Authority,

---

[2] On April 22, 2024, Rusfeldt filed a notice of supplemental authority, informing the Court of a recent Ninth Circuit decision, Meinecke v. City of Seattle, 99 F.4th 514, 518 (9th Cir. 2024). (ECF 116.)

572 F. App'x 23, 24 (2d Cir. 2014) (summary order) (quoting Matsushita Electric Industrial Co.,

Ltd. v. Zenith Radio Corporation, 475 U.S. 574, 587 (1986)).


DISCUSSION

    Rusfeldt asserts five claims: (1) violation of his right to freedom of speech under

the First Amendment; (2) violation of his right to free exercise of religion under the First

Amendment; (3) violation of his right to be protected from unreasonable seizure under the Fourth

Amendment; (4) violation of his right to equal protection under the Fourteenth Amendment; and

(5) violation of his right to due process under the Fourteenth Amendment.  He also seeks, in his

prayer for relief, a preliminary and permanent injunction against defendants' "heckler's veto

practices" and a declaration that N.Y. Penal Law § 240.20 is unconstitutionally vague and

overbroad, both facially and as applied to the facts of this case.  (ECF 83 at 15-23.)  Rusfeldt

moves for summary judgment on all of his claims, and defendants cross-move for summary

judgment in their favor.


I.  Rusfeldt's First Amendment Speech Claim Arising From His Arrest.

    "The First Amendment provides that 'Congress shall make no law . . . abridging

the freedom of speech.'  In general, we have held that the First Amendment prohibits the

Government from restricting or burdening 'expression because of its message, its ideas, its

subject matter, or its content.'"  Vidal v. Elster, 602 U.S. 286, 292 (2024) (citation omitted).

    To decide whether a restriction, if any, on speech violates the First Amendment,

courts must first determine whether the speech is the type of speech "protected by the First

Amendment, for, if it is not, we need go no further." Cornelius v. NAACP Legal Defense & Educational Fund, Inc., 473 U.S. 788, 797 (1985).

Here, the parties agree—and the Court concludes—that Rusfeldt's speech took place in a public forum—a public sidewalk of the City of New York, which is a traditional public forum. (Pl. 56.1 ¶ 89; Def. 56.1 Resp. ¶ 89.) The parties dispute whether Rusfeldt's speech is protected.

While "[t]he scope of permitted expression [under the First Amendment] is broad," insulting language "must be tolerated" unless those insults contain "threats of coercion that intimidate [or] fighting words that create the possibility of imminent violence." Rupp v. Buffalo, 91 F.4th 623, 634 (2d Cir. 2024) (quoting X-Men Security, Inc. v. Pataki, 196 F.3d 56, 68-69 (2d Cir. 1999), itself citing Chaplinsky v. New Hampshire, 315 U.S. 568 (1942)).

Defendants assert that the words used by Rusfeldt on a large sign held aloft on a pole, "Fags and Whores Burn in Hell," were intended by Rusfeldt "to shock and upset his target audience: members of the LGBTQ+ community. In that context his sign was fighting words unworthy of protection under the First Amendment." (ECF 109 at 32; footnote omitted.)

Defendants' position is profoundly wrong. Obnoxious and loathsome speech is protected under the First Amendment. Snyder v. Phelps, 562 U.S. 443, 458 (2011) (citation omitted) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); see also National Socialist Party of America v. Village of Skokie, 432 U.S. 43, 43–44 (1977) (per curiam) (vacating order enjoining "displaying any materials which incite or promote hatred against persons of Jewish faith"); Brown v. State of Louisiana, 383 U.S. 131, 133 n.1 (1966) (citations omitted) ("Participants in an orderly

SA15

demonstration in a public place are not chargeable with the danger, unprovoked except by the fact of the constitutionally protected demonstration itself, that their critics might react with disorder or violence.").[3] The Court accepts that the message communicated by Rusfeldt was "shock[ing] and upset[ing]," but his words are not fighting words because, in context, they were not "inherently likely to provoke violent reaction." Cohen v. California, 403 U.S. 15, 20 (1971) (citation omitted).[4]

Rusfeldt also asserts that the defendants violated his right to free expression under the First Amendment because they failed to intervene with the crowd of Pride festivalgoers until members of the crowd began throwing objects at him. (ECF 99 at 11-13.) Here, the record—including the video—demonstrates beyond dispute that the NYPD officers who were observing the crowd of Pride attendees from across the street did intervene as soon as one or more members of the group began throwing objects at Rusfeldt's group. (Video Part 1, 0:00-16:30.) At this point, at least five officers stationed themselves between Rusfeldt and the crowd of Pride attendees, and they also later placed metal barricades between Rusfeldt and the crowd.

Defendants' depositions also reiterate their understanding that they, in fact, could not intervene against the crowd until there was violence by a member of the crowd. (See, e.g., ECF 99-3, Hughes Deposition at Tr. 188.) See Musso v. Hourigan, 836 F.2d 736, 743 (2d Cir. 1988) ("We do not believe . . . that Mazzafero's alleged failure to prevent Millar from violating Musso's [F]irst [A]mendment rights transgressed any clearly established legal norm. As a general rule, a government official is not liable for failing to prevent another from violating a

---

[3] The Court in Brown cited to an article describing the phenomenon as a "heckler's veto," a term Rusfeldt uses frequently in his briefing. Id. (citing Kalven, The Negro and the First Amendment, pp. 140-60 (1965)).

[4] Rusfeldt correctly points out that defendants initially admitted that his expressive activities were protected speech in a Response to a Request for Admission (ECF 113 at 3-4; ECF 99-12 at 3) and should not be permitted to withdraw the admission. As an alternate ground, the Court agrees that the change of position would unfairly prejudice Rusfeldt, and defendants' request to be relieved of the admission is denied. Rule 36(b), Fed. R. Civ. P.

person's constitutional rights, unless the official is charged with an affirmative duty to act.").

The Court concludes that defendants' actions in not intervening before the crowd became

"unruly" does not constitute a restriction on Rusfeldt's speech—especially because Rusfeldt and

his group continued to speak even after the objects were thrown.

   The action of NYPD officers in placing physical barricades between Rusfeldt's

group and the crowd of Pride attendees, allowing the messages of each side to be heard or seen,

was a reasonable response not based on the content or viewpoint of opposing messages.  Perhaps

NYPD officers could have ordered the crowd of Pride attendees to disperse, but so long as the

decision not to do so was free of discrimination in favor of the crowd's viewpoint or against

Rusfeldt's, they were free to make this decision.  The NYPD officers were prohibited from

infringing the speech rights of Rusfeldt or the Pride attendees and, from the summary judgment

record, the placement of the barricades was the least restrictive means available to police officers

to maintain order and allow speech to be heard.  Their decision not to take other more aggressive

actions against the Pride festivalgoers did not preclude NYPD officers from taking action against

Rusfeldt if it was otherwise warranted.

   Rusfeldt mounts a First Amendment challenge to his arrest.  It stands or falls

principally on whether there was probable cause for his arrest.  The Supreme Court has

considered "whether probable cause to make an arrest defeats a claim that the arrest was in

retaliation for speech protected by the First Amendment."  Nieves v. Bartlett, 587 U.S. 391, 397–

98 (2019).  The Court concluded that the existence of probable cause defeated the claim.  Id. at

408.  The Court noted one possible exception to the rule: "Although probable cause should

generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances

where officers have probable cause to make arrests, but typically exercise their discretion not to do so." Id. at 406.

This Court concludes that the rule in Nieves applies here. Like the plaintiff in Nieves, Rusfeldt's action is brought under section 1983 and alleges that the defendants arrested him in retaliation for protected speech. (See ECF 83 ¶ 78 ("Defendants acted with a retaliatory intent or motive. . . .").) While there are distinctions between an arrest made in retaliation for protected expression in the workplace versus the street, the observations of the Nieves Court are directly relevant to both: "Police officers conduct approximately 29,000 arrests every day—a dangerous task that requires making quick decisions in 'circumstances that are tense, uncertain, and rapidly evolving.' . . . To ensure that officers may go about their work without undue apprehension of being sued, we generally review their conduct under objective standards of reasonableness." 587 U.S. at 403 (citations omitted).

Rusfeldt makes no effort to show that NYPD officers typically do not make arrests in similar circumstances when the participants are not engaged in expressive activity or when they are expressing a favored viewpoint. Rusfeldt's effort to draw a close analogy to police inaction in response to the conduct of the Pride crowd of festivalgoers fails. The police were across the street when objects were thrown in the direction of Rusfeldt, and the record does not permit the conclusion that the police had the ability to identify and arrest the offender or offenders. It was only Rusfeldt, and not any of the festivalgoers, who was on the sidewalk holding aloft a long metal pole supporting a banner, a pole which arguably presented a hazard to those in proximity to it. No reasonable factfinder could conclude that the waving of a rainbow flag by one Pride festivalgoer seen on a video presented a hazardous or physically offensive condition.

18

Rusfeldt asserts that as a matter of law there was no probable cause for his arrest. (ECF 83 ¶ 81; ECF 99 at 14-18.)  Defendants assert that as a matter of law there was probable cause for his arrest.  (ECF 109 at 17-21.)  The Court concludes that there are material issues of fact that preclude summary judgment.

The principal statute relied upon by the parties with respect to their probable cause arguments is N.Y. Penal Law § 240.20, which provides, in pertinent part, as follows:

> A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof: . . .
>
>> [(6)] He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or
>>
>> [(7)] He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose. . . .[5]

A.  Material Issues of Fact on the Issue of Probable Cause for a
     Violation of N.Y. Penal Law §240.20(6).

There are four elements necessary to establish probable cause to support an arrest under N.Y. Penal Law § 240.20(6): "(1) defendant congregated with other persons in a public place; (2) was given a lawful order of the police to disperse; (3) refused to comply with that order; and (4) acted 'with intent to cause public inconvenience, annoyance or alarm' or with recklessness to the 'risk thereof.'"  United States v. Nelson, 10-CR-414 (PKC), 2011 WL

---

[5] The Court finds that the other two provisions cited by the parties would not support summary judgment in favor of defendants.  N.Y. Penal Law § 240.10 prohibits "unlawful assembly": "A person is guilty of unlawful assembly when he assembles with four or more other persons for the purpose of engaging or preparing to engage with them in tumultuous and violent conduct likely to cause public alarm, or when, being present at an assembly which either has or develops such purpose, he remains there with intent to advance that purpose."  Rusfeldt and his group, however, only totaled four persons.  There is also a dispute as to whether the officers had probable cause to arrest Rusfeldt for violating N.Y. Penal Law § 195.05, which prohibits "intentionally obstruct[ing], impair[ing] or pervert[ing] the administration of law or other governmental function or prevent[] or attempt[] to prevent a public servant from performing an official function, by means of . . . physical force or interference."  Defendants assert that Rusfeldt's refusal to comply with their orders constitutes a violation of this statute as well.  (ECF 109 at 20.)  But for the reasons discussed, there is a genuine dispute as to which order, if any, amounted to a clear dispersal order.

1327332, at *3 (S.D.N.Y. Mar. 31, 2011), affirmed, 500 F. App'x 90 (2d Cir. 2012) (summary

order); cf. Provost v. City of Newburgh, 262 F.3d 146, 157 (2d Cir. 2001).

            Rusfeldt does not dispute that the NYPD gave him orders to leave the area, that he

understood these orders, and that he did not comply with them.  (Def. 56.1 ¶ 103; Pl. 56.1 Resp.

¶ 103.)  He also does not dispute that the NYPD officers were motivated by a desire to control or

maintain the public order "that was either disrupted or threatened to be disrupted by the crowd

that gathered around" him when they issued these orders.  (Def. 56.1 ¶ 106; Pl. 56.1 Resp. ¶

106.)  Rusfeldt argues, however, that these orders were not "orders to disperse," as the term is

used in N.Y. Penal Law § 240.20(6), and that they were also unlawful orders.  (Def. 56.1 ¶¶ 104,

106; Pl. 56.1 Resp. ¶¶ 104, 106.)

            An order by police for an individual to disperse or leave an area while exercising

his right to free speech is a restriction on that speech.  See Kass v. City of New York, 864 F.3d

200, 207-08 (2d Cir. 2017).  Because Rusfeldt was ordered to disperse under a New York statute

and that order restricted his speech, the Court must determine both whether the order was

"lawful" under New York law and whether it satisfied the requisite Supreme Court standard for a

restriction of Rusfeldt's constitutional rights under the First Amendment.  See id. (citations

omitted) ("The First Amendment, however, 'does not guarantee the right to communicate . . . at

all times and places or in any manner that may be desired.' . . . At issue here is the balance

between an individual's First Amendment right to engage in a conversation on a public sidewalk

with protestors and the government's interest in maintaining public safety and order."); Jones v.

Parmley, 465 F.3d 46, 60 (2d Cir. 2006) ("Plaintiffs' facts, as alleged, would also give rise to a

separate First Amendment violation even if the NYSP had a lawful basis to interfere with the

demonstration.").

The purported orders to disperse were not "arbitrary" and therefore were lawful under New York law.  See Meyers v. City of New York, 812 F. App'x 11, 14 (2d Cir. 2020) (summary order) (citations omitted) ("[W]e conclude that the dispersal order was lawful because it was intended to promote several legitimate governmental goals and was therefore not arbitrary. The City had a legitimate interest in ensuring that the Park remained accessible to all members of the public—not just the protestors—and free of congestion.").

The disorderly conduct statute is content and viewpoint neutral.  There is no evidence that officers who have probable cause to make arrests under section 6 of N.Y. Penal Law § 240.20 "typically exercise their discretion not to" arrest persons under similar circumstances.  Nieves, 587 U.S. at 406.  There is also no evidence that any officer was motivated by antipathy towards Rusfeldt's views.  There are several instances in the video where NYPD personnel are heard to state to Rusfeldt that they were respecting his First Amendment rights and that their orders to disperse were not based on the content of his sign or his other speech.  (See, e.g., Video Part 3 at 1:33-2:00 (an NYPD official telling Rusfeldt to collapse the metal pole but allowing him to continue to display the sign, saying, "It's not . . . the speech."); Video Part 1 at 18:31-33 (Pounds saying "I get it, I get it" when Rusfeldt stated he was exercising his right to free speech).)

Defendants concede that "the crowd was hostile to the viewpoints expressed by [Rusfeldt] and his group," although they also suggest that the crowd was drawn by the police presence that formed.  (Def. 56.1 Resp. ¶ 32.)  But defendants also dispute that they took action against Rusfeldt to leave because of the hostility of the crowd, citing Hughes's testimony that it was based on the "totality of the circumstances."  (Def. 56.1 Resp. ¶ 52.)

The parties do not dispute, and the video shows, that several officers, over the course of an hour, gave Rusfeldt "orders" or directives to leave the area—at times saying "order to disperse" and at times using other language. The first purported order to disperse occurred when, after NYPD officers crossed the street and spoke to Rusfeldt, Officer Pounds said to Rusfeldt, "Shut it down." (Video Part 1 at 16:50-52.) The parties dispute what Pounds meant by this—whether, for example, Pounds wanted Rusfeldt to stop speaking, or stop speaking and lower his sign, or to stop speaking in that particular location. (Pl. 56.1 ¶ 39; Def. 56.1 Resp. ¶ 39.)

Rusfeldt testified at deposition that he interpreted Pounds' directive to "shut it down" as an order to stop speaking or he would be arrested. (ECF 99-2 at Tr. 105-06.) But Pounds himself, however, at first testified that he did not recall if his initial comment to "shut it down" was an order to disperse and felt that Rusfeldt was only violating the statute once he refused to obey the order given to him once Pounds's supervisors arrived on the scene. (See ECF 99-9 at Tr. 26.)

Pounds was less than definitive that, when he told Rusfeldt to "shut it down" and suggested that they "go over there and talk about it," it was an order to leave the area. (Id. at Tr. 25 ("Q. You didn't tell him to leave the area at this point, did you? You just told him to shut it down and said, 'Let's go over there and talk about it.' A. If that's what the video shows, yes.").) Pounds also acknowledged that Hughes later ordered him to order Rusfeldt to leave the area, after which he gave such an order. (See id. at Tr. 42.)

Chief Hughes first testified at deposition that Rusfeldt was "subsequently arrested" for his refusal to obey Pounds's directive when he first arrived on the scene and told him to "shut it down." (ECF 99-3 at Tr. 152-54.) But Hughes ultimately testified that there was

22

SA22

uncertainty around which directive from the NYPD officers was the order to disperse that Rusfeldt disobeyed because it was all part of the "whole incident." (See id. at Tr. 241-42.)

Hughes also testified about his interaction with Rusfeldt once he arrived on the scene, when he told Rusfeldt to keep walking toward Broadway: "[T]he officers gave an order to disperse. I wanted to make sure he knew what disperse meant, and it meant making a turn and going two blocks down toward Broadway. That would be dispersal. I gave him clear instruction on how to disperse." (Id. at Tr. 197.) Hughes's instructions to Rusfeldt to proceed toward Broadway could therefore also be considered an "order to disperse." But Hughes then testified, referring to the various orders given to Rusfeldt over the space of the hour, "[Y]ou could add all those other ones, we're trying to give him a break. But no, it goes back to the first one. You want to—the first one or the 50th one at this point. But it's basically based on the first one, the whole crowd to get the crowd to disperse. He wasn't dispersing. . . . They could have gave it on any of those 50 directions. . . . I told the pastor, I said, 'You're getting arrested for the incident that happened around the corner.'" (See id. at Tr. 242-43.)

Finally, Captain Mark Turner testified that when he arrived on the scene, he also "asked" Rusfeldt to leave the location, which could also be construed as an order to disperse. (See ECF 99-4 at Tr. 26.) This testimony reveals an ambiguity about whether Turner himself gave an order or if he believed that he had only "asked" Rusfeldt and his group to move but later enforced Hughes's order for the group to head toward Broadway. But Hughes, in his testimony, was under the impression that Turner had also given an order to disperse. (ECF 99-3 at Tr. 241-42.)

The Court need not recount every fact of record demonstrating a genuine dispute over the dispersal order. Because there are serious questions of which order, if any, amounted to

23

a clear dispersal order, there is a material issue of fact as to whether there was probable cause for

the arrest under section 240.20(6).  The Court will allow the issue to be presented to the jury.


      B.   Material Issues of Fact on the Issue of Probable Cause for a
           Violation of N.Y. Penal Law § 240.20(7).

      The Court also concludes that there is a genuine issue of material fact as to

whether there was probable cause to arrest Rusfeldt for violating subsection (7) of N.Y. Penal

Law § 240.20 by either blocking traffic or carrying a pole.  As noted, a person is guilty of a

violation of this provision when he "creates a hazardous or physically offensive condition by any

act which serves no legitimate purpose. . . ." and "with intent to cause public inconvenience,

annoyance, or alarm, or recklessly creating a risk thereof. . . ."

      Defendants argue that they had probable cause to arrest Rusfeldt for violating this

subsection of the statute because he was "creat[ing] a hazardous or physically offensive

condition by any act which serves no legitimate purpose."  Defendants cite two reasons for this

violation: (1) because the crowd around Rusfeldt was creating a traffic hazard, and (2) because

Rusfeldt's sign was on a large metal pole that was unsafe.[6]

      Many of the officers on scene, including Turner, stated that Rusfeldt was causing

a dangerous condition by blocking the sidewalk.  (See, e.g., ECF 99-4 at Tr. 25-26.)  Rusfeldt

himself testified that his own group was not blocking the sidewalk, which he understood was

illegal.  (ECF 99-2 at Tr. 33).  Several vehicles are seen driving past the crowds on the video,

despite the barriers placed on Washington Square East, and Hughes testified the road was not

"formally closed," but was "traffic restricted" at that point.  (ECF 99-3 at Tr. 122-23.)

_____

[6] In addition, Chief Hughes also stated that plaintiff did not have a "sound permit" for the bullhorn his companion
was using to preach but conceded that the use of the bullhorn did not "form any basis for the plaintiff's arrest."
(ECF 99-3 at Tr. 247-48.)

There is also a genuine issue of material fact as to whether Rusfeldt's actions in creating a hazardous condition served a "legitimate purpose." Rusfeldt asserts that his actions were legitimate because he was exercising his right to free speech, which Defendants dispute. (ECF 99 at 16-17.)

Because there are genuine disputes over the facts that officers relied on to demonstrate probable cause, the Court will allow that question to be submitted to the jury. See Dufort v. City of New York, 874 F.3d 338, 348 (2d Cir. 2017) (citations omitted) ("Probable cause is a mixed question of law and fact. Questions of historical fact regarding the officers' knowledge at the time of arrest are to be resolved by the jury. However, 'where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court.'").

II.    Rusfeldt's Facial Challenges to N.Y. Penal Law § 240.20 (6) & (7) Fail,
       and His As-Applied Challenge Must Await Further Factual Development.

Rusfeldt challenges the facial constitutionality of N.Y. Penal Law § 240.20(6) & (7) as overbroad and vague. The argument is developed in two-and-one-half pages of briefing in Rusfeldt's opening memorandum and about one page in defendants' response. (ECF 99 at 21-23; ECF 109 at 25-26.)

"The elements of First Amendment overbreadth analysis are familiar. Only a statute that is substantially overbroad may be invalidated on its face. . . . 'We have never held that a statute should be held invalid on its face merely because it is possible to conceive of a single impermissible application. . . .' Instead, '[i]n a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.'" City of Houston v. Hill, 482 U.S.

25

SA25

451, 458–59 (1987) (citations omitted).  The substantiality is to be judged "in relation to the

statute's plainly legitimate sweep." United States v. Stevens, 559 U.S. 460, 473 (2010) (quoting

Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 449 n.6 (2008)).

"A statute can be impermissibly vague for either of two independent reasons.

First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand

what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and

discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000).  "Where a statute's

literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression

sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in

other contexts." Farrell v. Burke, 449 F.3d 470, 485 (2d Cir. 2006) (quoting Smith v. Goguen,

415 U.S. 566, 573 (1974)).

Here, subdivision 6 of section 240.20 requires proof of an "intent to cause public

inconvenience, annoyance, or alarm, or recklessly creating a risk thereof," "congregat[ing] with

other persons in a public place," and a refusal "to comply with a lawful order of the police to

disperse."  Similarly, subdivision 7 contains the same elements, but in lieu of the disobedience to

a dispersal order, it requires proof of the creation of "a hazardous or physically offensive

condition by any act which serves no legitimate purpose. . . ."

Neither subdivision, by its express terms, reaches nor excludes speech or other

expressive activities.  Both subdivisions 6 and 7 could be read to reach speech that is merely an

"annoyance" to others.  The parties have failed to address whether there has been any "narrowing

state court interpretation" that should be into taken account in addressing the purported

vagueness and overbreadth of the statute.  Citation to a case upholding the constitutionality of a

similarly worded statute while disclaiming an intent to limit the reach of that statute is not quite

SA26

the same thing.  People v. Tichenor, 89 N.Y.2d 769, 772–76 (1997).  Of course, the statute

would still require satisfaction of the intent element, congregating with other persons, and either

the refusal to comply with a dispersal order or the creation of a hazardous or physically offensive

condition.

   The Court denies Rusfeldt's facial challenge to the two statutes on this record

without prejudice to renewal after trial.  The challenges to the statutes as applied also must await

trial and a record that clarifies Rusfeldt's own conduct and that of the officers.


  III.    Rusfeldt's First Amendment Free Exercise of Religion Claim.

   Rusfeldt's First Amendment free exercise of religion claim occupies one

paragraph of his moving memorandum of law.  (ECF 99 at 23-24.)  "To prevail on his Free

Exercise claim, [plaintiff] must first show that a state action sufficiently burdened his exercise of

religion. . . . Once a plaintiff demonstrated that his free exercise rights were substantially

burdened by state action, courts traditionally upheld the state action only if it was justified by a

compelling state interest."  Genas v. State of N.Y. Department of Corrections Services, 75 F.3d

825, 831 (2d Cir. 1996).

   "It is not a violation of the Free Exercise Clause to enforce a generally applicable

rule, policy, or statute that burdens a religious practice, provided the burden is not the object of

the law but merely the 'incidental effect' of an otherwise valid neutral provision."  Seabrook v.

City of New York, 210 F.3d 355 (2d Cir. 2000) (summary order) (citation omitted); Agudath

Israel of America v. Cuomo, 980 F.3d 222, 226 (2d Cir. 2020) (per curiam) (citation omitted).

Courts have "repeatedly refused to find free exercise violations where the laws or rules at issue

'do not bar any particular religious practice,' . . . or where the plaintiff does not even allege that

the rule targets or was motivated to prohibit certain religious beliefs. . . ." Seabrook, 210 F.3d 355 (citations omitted).

New York's disorderly conduct statute is a neutral provision that does not by its terms impose any burden on a particular religious practice or target any religious beliefs. The Court accepts as true that there was a religious component to Rusfeldt's speech—or street preaching—motivated by a desire to convey a Christian evangelical message. But no action or inaction of defendants is attributed to the religious aspect of his message. There is nothing in the summary judgment record beyond the legal labels in Rusfeldt's First Amended Complaint and his memorandum of law to support a claim. (ECF 83 ¶¶ 81-86; ECF 99 at 23-24.)

The Court will grant summary judgment to the defendants on Rusfeldt's First Amendment Free Exercise claim.

IV.    The Fourth Amendment Claim Turns on the Disputed Question of Probable Cause.

Rusfeldt also asserts that his arrest violated his Fourth Amendment right to be free from seizures of the person. The existence of probable cause for an arrest defeats a Fourth Amendment claim as well. Marcavage v. City of New York, 689 F.3d 98, 109–10 (2d Cir. 2012) (citations omitted) ("A Fourth Amendment claim turns on whether probable cause existed to arrest for any crime, not whether probable cause existed with respect to each individual charge. Accordingly, Defendants prevail if there was probable cause to arrest Plaintiffs for any single offense."). The disputed issues of fact relating to the existence of probable cause preclude the grant of relief to either side.

V.    Rusfeldt's Equal Protection Claim.

     Rusfeldt asserts an equal protection "class-of-one" type claim, asserting that he

was singled out for selective enforcement of a criminal statute based upon his speech and

religion, noting specifically that none of the Pride festivalgoers were arrested that day.  (ECF 83

¶¶ 90-91.)  "To proceed under a selective enforcement theory, Plaintiffs must plausibly allege

that any selective treatment they experienced 'was motivated by an intention to discriminate on

the basis of impermissible considerations, such as race or religion, to punish or inhibit the

exercise of constitutional rights, or by a malicious or bad faith intent to injure [them].'"  Lilakos

v. New York City, 808 F. App'x 4, 8 (2d Cir. 2020) (summary order) (quoting Zahra v. Town of

Southold, 48 F.3d 674, 683 (2d Cir. 1995)).  Rusfeldt need not show malice, but he must show

that "there is no rational basis for the difference in treatment. . . . "  Village of Willowbrook v.

Olech, 528 U.S. 562, 564 (2000) (citations omitted); Lilakos, 808 F. App'x at 8.

     In addition, plaintiffs must show "an extremely high degree of similarity between

themselves and the persons to whom they compare themselves."  Clubside, Inc. v. Valentin, 468

F.3d 144, 159 (2d Cir. 2006) (citation omitted).  "Accordingly, to succeed on a class-of-one

claim, a plaintiff must establish that '(i) no rational person could regard the circumstances of the

plaintiff to differ from those of a comparator to a degree that would justify the differential

treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances

and difference in treatment are sufficient to exclude the possibility that the defendants acted on

the basis of a mistake.'"  Id. (citation omitted).

     Rusfeldt's claim fails because there is not a high degree of similarity between his

circumstance and that of the Pride festivalgoers in the crowd who expressed hostility to his

message.  First, there is no showing that those members of the crowd who threw objects or

29

liquids could have been identified by law enforcement and apprehended for the crime of assault. The police moved into position only after viewing the scene of objects being thrown from a distance. Nor is there any factual showing by plaintiff that any member of the crowd of Pride attendees was disobeying a lawful order to disperse,[7] blocking a sidewalk, or carrying a large metal pole.[8]

The Court will grant summary judgment to defendants on Rusfeldt's equal protection claim.

VI.    The Qualified Immunity Defense of Hughes Must Await Further Factual Development.

Assistant Chief Hughes was not on the scene for most of the events at issue in this action. He arrived on the scene after it had been unfolding for about an hour. (Pl. 56.1 ¶ 50; Def. 56.1 Resp. ¶ 50.) The undisputed evidence is that, prior to making the arrest, Hughes consulted with the NYPD Legal Bureau for the purpose of seeking legal advice. (Pl. 56.1 Resp. ¶ 105; Def. 56.1 ¶ 105.) He argues that he is entitled to qualified immunity.

"[I]t is not necessary for a district court to determine whether in fact the First Amendment was violated before deciding whether a defendant is entitled to qualified immunity. . . . [T]he whole point of the qualified immunity defense is to allow a defendant to be dismissed out of the case even if a right was actually violated (i.e., where it can be shown that the right asserted was not clearly established at the time, or that if the right was clearly established, it was objectively reasonable for the defendant to believe he or she was not violating it)." McCullough

_____

[7] Plaintiff asserts there was no dispersal order issued to the crowd of Pride attendees. Defendants admit that they did not give an official dispersal order to the crowd, for example via bullhorn; instead, they assert that they did direct NYPD resources toward moving the crowd along, including by arresting Rusfeldt and potentially telling other individuals in the crowd to continue moving. (See Def. 56.1 Resp. ¶¶ 76-80; Pl. 56.1 ¶¶ 76-80.)

[8] As noted, one Pride festivalgoer is seen in a video waving a rainbow flag, but no reasonable factfinder could conclude that it presented a hazardous or physically offensive condition.

30

v. Wyandanch Union Free School District, 187 F.3d 272, 277 (2d Cir. 1999).  "In the context of

false arrest . . . claims, an officer is entitled to qualified immunity if he had either probable cause

or 'arguable probable cause.'"  Dufort v. City of New York, 874 F.3d 338, 354 (2d Cir. 2017)

(citations omitted).  "Arguable probable cause 'exists when a reasonable police officer in the

same circumstances and possessing the same knowledge as the officer in question could have

reasonably believed that probable cause existed in the light of well-established law.'"  Soukaneh

v. Andrzejewski, 112 F.4th 107, 122–23 (2d Cir. 2024) (citations omitted).

  The parties are in agreement that Hughes spoke to the NYPD Legal Bureau at

some point before arresting Rusfeldt.  (Pl. 56.1 Resp. ¶ 105; Def. 56.1 ¶ 105.)  Pointedly, the

defendants do not state what he was told by the NYPD Legal Bureau.  Rusfeldt disputes any

implication that the NYPD Legal Bureau told Hughes that the arrest was lawful, because Hughes

invoked the attorney-client privilege at his deposition, as is his right.  (Pl. 56.1 Resp. ¶ 105; Def.

56.1 ¶ 105.)

  Hughes may be entitled to qualified immunity in this action, but based upon the

record established, there are questions of fact concerning the existence of probable cause and

Hughes's role in the arrest.  He has no valid claim—at least at this point—that he relied on legal

advice that the arrest was lawful.

  Hughes's claim of qualified immunity is denied without prejudice.


VII. The Police Commissioner Will Be Dismissed From The Action In His Official Capacity.

  Defendants also ask the Court to dismiss the Police Commissioner in his official

capacity.  (ECF 109 at 29.)  Rusfeldt does not oppose this dismissal.  (ECF 113 at 40 n.9.)  The

Court will therefore grant this request.

31

CONCLUSION

Rusfeldt's motion and defendants' motion for summary judgment are DENIED

without prejudice as to the facial and as applied challenges to N.Y. Penal Law § 240.20(6) & (7)

(Fifth Claim). Rusfeldt's summary judgment motion is otherwise DENIED. Defendants' motion

for summary judgment is GRANTED to the extent that it dismisses Rusfeldt's Free Exercise

claim (Second Claim) and his Equal Protection claim (Fourth Claim). Defendant Hughes's

motion for summary judgment on the basis of qualified immunity is denied without prejudice to

renewal at trial. The Police Commissioner in his official capacity is DISMISSED on motion of

defendants not opposed by Rusfeldt. Defendants' summary judgment motion is otherwise

DENIED.

Within in seven days, plaintiff shall file a proposed order to amend the caption.

The Clerk of Court is respectfully requested to terminate the motions (ECF 98,

107).


SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated:      New York, New York
            September 30, 2024

SA32

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
PASTOR ADEN RUSFELDT,

                    Plaintiff,                              22-cv-594 (PKC)

        -against-                                           OPINION AND ORDER

CITY OF NEW YORK, NEW YORK;
and STEPHEN HUGHES, in his Individual and
Official Capacity as Assistant Chief of the New
York City Police Department,

                    Defendants.
-------------------------------------------------------------x

CASTEL, U.S.D.J.

        These are the Court's rulings on post-verdict motions by plaintiff Aden Rusfeldt

in his action against Stephen Hughes, an assistant Chief in the New York City Police Department

("NYPD"), and the City of New York ("the City"). Rusfeldt claimed that he was wrongfully

arrested on June 27, 2021, in violation of his First and Fourth Amendment rights while he

engaged in street preaching at PrideFest, an LGBTQ+ festival annually held in Manhattan.

Much of the background to this case is laid out in a prior opinion on a motion for summary

judgment which the Court need not recount. Rusfeldt v. City of New York, 22-cv-594 (PKC),

2024 WL 4354874 (S.D.N.Y. Sept. 30, 2024). On June 18, 2025, following a three-day trial on

liability issues, the jury returned a verdict in favor of Hughes and the City on all claims.

        Presently before the Court is plaintiff's renewed motion for judgment as a matter

of law, Rule 50, Fed. R. Civ. P., or, in the alternative, for a new trial, Rule 59, Fed. R. Civ. P.

Rusfeldt principally argues that he is entitled to post-verdict relief on his so-called "heckler's

veto" claim, the gist of which is that the police may not act based upon a crowd's hostility to a

speaker's viewpoint. In his motion, Rusfeldt argues that "This concept—the heckler's veto—is

an extremely esoteric aspect of constitutional law that even many lawyers do not understand."
(ECF 166-1 at 22.)

On the evidence presented, both Rusfeldt and the PrideFest attendees were engaging in protected speech. A threat to public safety arose when an apparent PrideFest attendee or attendees threw water bottles or similar objects in the direction of Rusfeldt and three others in his group. The thrower(s) could not be identified because of the size and density of the crowd. The police intervened and formed a cordon to protect Rusfeldt and his small group augmented by a metal barricade. In dealing with two groups of persons congregating with others and acting with the requisite intent under the disorderly conduct statute, a police officer may order either or both groups to disperse provided he acts to promote public order and does not act in an arbitrary manner. While there is no separate "heckler's veto" claim recognized by controlling precedent, a police officer also may not base his actions on viewpoint discrimination, including a crowd's hostility or affection to an individual's protected speech. There is no evidence that any police officer participating in Rusfeldt's arrest did so. A reasonable jury could conclude and did conclude that police officers acted with probable cause to arrest Rusfeldt under N.Y. Penal Law § 240.20(6) when he disobeyed a lawful order to disperse.[1] A reasonable jury on the evidence presented could conclude and did conclude that Rusfeldt failed to prove his First and Fourth Amendment claims and thus his motion for judgment as a matter of law must be denied. The Court also concludes that his motion for a new trial should also be denied because the verdict was not against the weight of the evidence and he has failed to show that any instruction to the jury was erroneous.

---

[1] "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: . . . (6) he congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse." N.Y. Penal Law § 240.20(6).

I.    Motion for Judgment as a Matter of Law

A. Rule 50 Standard

Rule 50(a), Fed. R. Civ. P., provides that "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party," the Court may, upon motion, grant judgment as a matter of law in the movant's favor. "A movant's burden securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict." Cross v. New York City Transit Authority, 417 F.3d 241, 248 (2d Cir. 2005). "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence," which are functions reserved for the jury. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-51 (2000)). "[T]he district court may set aside the verdict only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against [the movant]." Cross, 417 F.3d at 248 (internal quotation marks omitted).

B. The Facts

Virtually all of the relevant events occurring on June 27, 2021, the day of Rusfeldt's arrest, were captured on video recorded by Rusfeldt's wife. (Tr. 49; Ex. A1, A2, and A3.) On June 27, Rusfeldt went to Washington Square Park in New York City with his wife, his stepson and a friend to preach at PrideFest taking place in the vicinity of the park. (Tr. 44-45, 48.) Once at Washington Square Park, Rusfeldt revealed a shirt he was wearing that read, "Attention Feminists Submit to Jesus" on the front. (Tr. 54-55.) He then unfurled a large banner

- 3 -

that read, "Fags and whores burn in hell. Repent, obey Jesus." (Tr. 55.) He held the banner

aloft on a metal pole. (Tr. 55.) After holding up the banner, Rusfeldt said to his small group,

"It's about to get crazy." (Tr. 56.) Rusfeldt's friend began to preach with a megaphone against

LGBTQ+ ways of life. (Tr. 57.) The activity by Rusfeldt's group attracted the attention of

festivalgoers who began to gather near the group. (Tr. 60.)

   The festivalgoers taunted and teased Rusfeldt and the three others but no

threatening behavior was exhibited. (Id.) There were officers of the NYPD nearby, but none

intervened until one or more individuals in the crowd threw objects, appearing to be plastic

bottles, in the direction of Rusfeldt's group. (Tr. 61-62.) After this, five officers who had been

standing across the street first approached Rusfeldt's group. (Tr. 62, 115.) Officer Nicholas

Pounds, who was among the approaching officers, testified that he was unable to identify the

bottle-thrower(s). (Tr 176.) The thrower(s) faces are not visible in the video. (Ex. A1 at 16:00-

16:28.)

   Pounds testified that he and other officers decided to intervene because the crowd

was "throwing bottles towards [Rusfeldt] and his group, and they were also blocking traffic."

(Tr. 176.) Pounds testified that, "At that point, I believe that the quickest way to deescalate the

situation was to move the plaintiff from the location." (Tr. 187.) Pounds testified that he was not

motivated by Rusfeldt's message and his only concern was "public safety." (Tr. 188.)

   One of the officers then told Rusfeldt to "shut it down" and that there was a risk

of someone getting hurt. (Tr. 116-17.) An officer asked Rusfeldt to lower his banner. (Tr. 118.)

Rusfeldt declined and asked to speak to a higher-ranking officer. (Id.) Another officer told

Rusfeldt that he was causing an unsafe situation and Rusfeldt responded that he understood. (Tr.

120-21.) While the police officers waited for a supervisor, the officers stood as a barrier between

Rusfeldt's group and the crowd. (Tr. 121.) In the video, the officers are seen standing with their backs to Rusfeldt and facing the crowd. (Ex. A1 at 24:16-31:30.)

The supervisor, NYPD Captain Mark Turner, arrived and told Rusfeldt that he had a constitutional right to speak, but the situation had become dangerous. (Tr. 123-24.) Rusfeldt again declined to move. (Tr. 124.) Rusfeldt then told his friend to stand on a stool to continue preaching to the crowd. (Tr. 128.) At some point, more officers gathered and placed a metal barricade between Rusfeldt and the crowd. (Tr. 129.) Rusfeldt directed his wife to create a new sign that read, "Homos are rapists." (Tr. 133-34.) Rusfeldt then yelled the phrase to the large crowd that had gathered. (Tr. 137.) Captain Turner then told Rusfeldt he would have police remove him. (Tr. 69-70.) Rusfeldt again declined to move. (Tr. 70.)

At a later point, NYPD Assistant Chief Hughes arrived. (Tr. 229.) Hughes decided to endeavor to persuade Rusfeldt and his group to disperse in order to diffuse the situation. (Tr. 233.) Hughes testified that he was concerned about the officers' safety and that he was not motivated by his feeling towards either Rusfeldt's or the crowd's messages. (Tr. 235, 268.) Hughes told the jury that he was concerned for the officers because "they had their back to somebody with a six-foot metal pole and they had a crowd in the front." (Tr. 235.)

Hughes instructed Rusfeldt to walk towards Broadway. (Tr. 240.) One of the sergeants, at Hughes' direction, asked Rusfeldt to take the banner off of the pole and to hold it. (Tr. 241.) After much discussion with Rusfeldt, Rusfeldt and the three others began to walk along the street, turned a corner for about twenty feet and refused to move any further. (Tr. 159.) Members of the crowd continued to gather near Rusfeldt and his group. (Tr. 167.) Several officers approached Rusfeldt and told him it was dangerous for him stay on the block and asked him to move a few blocks down. (Tr. 157.) Hughes told Rusfeldt that he was creating an unsafe

- 5 -

situation, endangering the officers who protected him, and that he had a right to speak, but had to move off of the block.  (Tr. 160.)

Officer Pounds then gave another directive for Rusfeldt to leave.  (Tr. 251.) Hughes told Rusfeldt that he was going to be arrested.  (Id.)  Rusfeldt testified that he decided he was not going to leave and said to the officers, "Arrest me."  (Tr. 156, 159.)  Hughes then authorized the officers to arrest Rusfeldt.  (Tr. 253.)  Rusfeldt was handcuffed, taken into custody and issued a summons for Disorderly Conduct under N.Y. Penal Law § 240.2 (6) & (7) and released.  The summons was eventually dismissed against Rusfeldt.  (Tr. 77.)

In his trial testimony, Rusfeldt acknowledged that he was given multiple orders to disperse.[2]  Rusfeldt challenged the lawfulness of these orders.  Defendants rested their defense to Rusfeldt's First and Fourth Amendment claims on the existence of probable cause to arrest Rusfeldt for disorderly conduct, a misdemeanor.  After the three-day trial, the jury found that Rusfeldt was not (1) arrested "in violation of a right protected by the Fourth Amendment as defined by the Court" and (2) not "deprived . . . of a right protected by the First Amendment as defined by the Court."  (Verdict Form, ECF 163.)

---

[2] In the pre-trial order, the parties' stipulated that "the order issued by NYPD Officer Pounds to Pastor Aden at the beginning of the third video segment, see Video Part 3 (ECF 99-8) at 0:01-15, was an 'order to disperse' under N.Y.P.L. § 240.20(6); and . . . Pastor Aden understood that 'order to disperse' and refused to comply with it because he believed it violated his federal constitutional rights."  (Joint Final Trial Report, ECF 135 at 2.)

C. Rusfeldt's Motion for Judgment as a Matter of Law Will Be Denied.

Rusfeldt urges that he is entitled to judgment as a matter of law because he has established all elements of his First Amendment and Fourth Amendment claims. Particularly, Rusfeldt argues that the jury erred because the order to disperse given by officers was not lawful and could not have served as a basis for probable cause.

On the trial evidence, a reasonable jury could conclude that there was probable cause to arrest Rusfeldt for disorderly conduct. Under New York law, a person is guilty of disorderly conduct when, "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: . . . he congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse." N.Y. Penal Law § 240.20(6). "An officer has probable cause to arrest when he or she has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" Jaegly v. Couch, 439 F.3d 149, 152 (2d Cir. 2006) (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)). There are four elements necessary to establish probable cause for an arrest under section 240.20(6): "the individual (1) congregated with other persons in a public place; (2) was given a lawful order of the police to disperse; (3) refused to comply with that order; and (4) acted with intent to cause or recklessly created a risk of public inconvenience, annoyance, or alarm." Kass v. City of New York, 864 F.3d 200, 211 (2d Cir. 2017).

Probable cause is an absolute defense to a Fourth Amendment false arrest claim. Jaegly, 439 F.3d at 152. "Probable cause is a mixed question of law and fact . . . [q]uestions of historical fact regarding the officers' knowledge at the time of arrest are to be resolved by the jury." Dufort v. City of New York, 874 F.3d 338, 348 (2d Cir. 2017) (internal citations omitted).

- 7 -

The Court gave a complete set of instructions to the jury on probable cause, including when an order is "lawful." The Court put the question of whether the orders were lawful to the jury, instructing them that "[a]n order to disperse is lawful if its purpose is to promote public order and was not issued in a purely arbitrary manner. An order that is motivated by an intent to suppress or discriminate against a particular viewpoint is not a lawful order." (Tr. 375.) The instructions on "lawful" directives were consistent with existing law. See, e.g., Kass, 864 F.3d at 212 (concluding that an order is lawful when the direction was not "arbitrary" and was calculated "to promote the public order") (collecting cases); Meyers v. City of New York, 812 Fed. App'x 11, 14 (2d Cir. 2020) (summary order) (concluding that a dispersal order was lawful when "it was intended to promote several legitimate governmental goals and therefore not arbitrary").

There was ample evidence to support the jury's conclusion that the officers had probable cause to arrest plaintiff. First, Rusfeldt testified and acknowledged that he was given multiple orders to disperse. (Tr. 139, 149.) Rusfeldt testified that he understood these to be orders to disperse but refused. (Tr. 155, 163-64.) Next, the jury heard from Pounds and Hughes. The jury heard that the officers were required to know the elements of various provisions of penal law. (Tr. 191.) Pounds testified that he understood a failure to follow a lawful order or creating a dangerous or hazardous condition would constitute disorderly conduct under New York law. (Tr. 191.) Pounds testified that a hazardous condition had formed, with the crowd throwing bottles and blocking traffic on the road. (Tr. 176.) Hughes testified that he was also concerned for the safety of the officers who were separating Rusfeldt from the crowd. (Tr. 235.) The jury heard both Hughes' and Pounds' testimony that their actions were not motivated by their feelings towards either Rusfeldt's or the crowd's message. (Tr. 188, 268.) On this

- 8 -

**SA40**

evidence, a reasonable jury could conclude that Rusfeldt had failed to prove his Fourth Amendment false arrest claim.

Generally, probable cause also defeats a First Amendment retaliation claim. Nieves v. Bartlett, 587 U.S. 391, 404 (2019). There is a narrow exception under Nieves. Id. Probable cause does not defeat a retaliatory arrest claim when the plaintiff produces "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." Gonzalez v. Trevino, 602 U.S. 653, 655 (2024) (citing Nieves, 587 at 407).

The evidence before the jury of possible relevance to the Nieves claim was the lack of an arrest of a person or persons who threw objects, apparently water bottles, in the direction of Rusfeldt and the three other persons with him at the June 27 event. A reasonable jury, however, could conclude that the person or persons throwing the objects were not similarly situated because the presence of a large number of LBGTQ+ festivalgoers in close density did not permit officers of the NYPD to identify the bottle thrower(s), thereby depriving officers of the ability to make a lawful arrest. There was also evidence that a Pride Fest attendee held aloft a pole with a banner or flag and was not arrested. (Tr. 66.) Hughes testified, however, that participants in a parade or event for which a permit is issued, including Pride Fest, are permitted to have poles with banners or flags. (Tr. 272.) This testimony was unrebutted. A reasonable jury could conclude that a person participating in a permitted event was not similarly situated to Rusfeldt. Thus, a reasonable jury could conclude that Rusfeldt had failed to prove his First Amendment claim.

Rusfeldt also moves for judgment as a matter of law to his Equal Protection Claim, but his claim was dismissed before trial on defendants' summary judgment motion. See

- 9 -

Rusfeldt, 2024 WL 4354874, at *15-16.  As this claim had already been dismissed, his motion

for judgment as a matter of law on all claims will be denied.

II.    Motion for a New Trial.

A.  Rule 59 Standard.

"A court may grant a new trial 'for any reason for which a new trial has heretofore

been granted in an action at law in federal court,' including if the verdict is against the weight of

the evidence."  Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 417 (2d Cir. 2012) (quoting

Fed. R. Civ. P. 59(a)(1)(A)).  For the purposes of a Rule 59 motion, "a decision is against the

weight of the evidence . . . if and only if the verdict is seriously erroneous or a miscarriage of

justice."  Farrior v. Waterford Board of Education, 277 F.3d 633, 635 (2d Cir. 2002).

"On new trial motions, the trial judge may weigh the evidence and the credibility

of witnesses and need not view the evidence in the light most favorable to the verdict winner."

Raedle, 670 F.3d at 418.  However, the Court should "should rarely disturb a jury's evaluation of

a witness's credibility . . . and may not freely substitute his or her assessment of the credibility of

witnesses for that of the jury simply because the judge disagrees with the jury."  Id. (internal

citations and quotation marks omitted).

"An erroneous jury instruction requires a new trial, unless the error is harmless."

Velez v. City of New York, 730 F.3d 128, 134 (2d Cir. 2013).  "A jury instruction is erroneous if

it misleads the jury as to the correct legal standard or does not adequately inform the jury on the

law."  Anderson v. Branen, 17 F.3d 552, 556 (2d Cir. 1994).  When determining whether a jury

charge is erroneous, must consider if the instructions "taken as a whole and viewed in light of the

evidence, show no tendency to confuse or mislead the jury as to principles of law which are

applicable."  Hathaway v. Coughlin, 99 F.3d 550, 552-53 (2d Cir. 1996)).

B. <u>The Jury's Verdict Was Not "Seriously Erroneous" or a "Miscarriage of Justice."</u>

      Rusfeldt asserts that the verdict was against the weight of the evidence. He argues that the evidence shows that defendants took law-enforcement action against Rusfeldt because of the actions of the crowd, not because of Rusfeldt's own actions.

      The Court has reviewed the evidence and there is nothing that would support a claim that the jury's verdict was erroneous. The jury heard the testimony of the witnesses, assessed their credibility, resolved any inconsistencies, and contemplated the relative weight of the evidence. The weight of the evidence supports the jury's conclusion that the officers had probable cause to arrest Rusfeldt for failure to comply with a lawful order to disperse. Further, Rusfeldt did not present objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been. The jury's finding that Rusfeldt had not proven his First and Fourth Amendment claims was consistent with the greater weight of the evidence.

C. <u>The Jury Instructions Were Not Erroneous.</u>

      Rusfeldt asserts that several of the Court's instructions were erroneous. First, he claims that the Court erroneously assigned the burden of proof on probable cause to him on the First Amendment claim. While the Court instructed the jury that the burden of proving probable cause on the Fourth Amendment false arrest claim was on the defendants, it explained that the burden of proof on probable cause on the First Amendment claim was on the plaintiff.

      There was good reason for instructing the jury on the different burden between the Fourth Amendment and First Amendment claims: the holding in <u>Nieves</u> requires a plaintiff alleging that he was arrested in retaliation for the exercise of his First Amendment rights to prove the absence of probable cause. 587 U.S. at 402 ("The plaintiff pressing a retaliatory arrest claim

must plead and prove the absence of probable cause for the arrest."). No objection was made to

the proposed instruction that was given to Rusfeldt's lawyer in draft form in a timely fashion.

(Court Ex. 4, Tr. 312-23.) Under Rule 51, Fed. R. Civ. P., a party who wishes to object to a

Court's jury instruction "must do so on the record, stating distinctly the matter objected and the

grounds for the objection." Fed. R. Civ. P. 51(c)(1). In order to later challenge a jury instruction,

"a party must object [to the instructions] before the jury retires to deliberate." Jarvis v. Ford

Motor Co., 283 F.3d 33, 56 (2d Cir. 2002). Therefore, "[f]ailure to object to a jury instruction . .

. prior to the jury retiring results in a waiver of that objection." Lavoie v. Pacific Press & Shear

Co., 975 F.2d 48, 55 (2d Cir. 1992). Rusfeldt had a full and fair opportunity to object to the jury

instructions. The Court provided all parties with a copy and reviewed it with the parties.

Accordingly, this objection that Rusfeldt now raises for the first time is deemed waived and, in

any event, is without merit.

Rusfeldt also argues challenges the Court's instruction to the jury that "[a]n order

that is motivated by an intent to suppress or discriminate against a particular viewpoint is not a

lawful order." (Tr. 375.) Rusfeldt had previously raised this objection after the jury instructions

had been read to the jury. (Tr. 388.) According to Rusfeldt, "[w]hile this charge was technically

not incorrect, it was incomplete and confusing insofar as it did not specify that a dispersal order

is necessarily motivated by an intent to suppress or discriminate against a particular viewpoint if

it was motivated by officers' desire to restore public safety that was disturbed by a crowd's

hostile reaction to the plaintiff's speech." (ECF 166-1 at 21-22.) The instruction given by the

Court was plain and clear and consistent with precedent:

> An order to disperse is lawful if its purpose is to promote public
> order and was not issued in a purely arbitrary manner. An order that
> is motivated by an intent to suppress or discriminate against a
> particular viewpoint is not a lawful order.

- 12 -

SA44

(Tr. 375.) An order to disperse is lawful unless "the order was 'purely arbitrary' and 'not calculated in any way to promote the public order.'" Crenshaw v. City of Mount Vernon, 372 Fed. App'x. 202, 206 (2d Cir.2010) (summary order) (quoting People v. Galpern, 258 N.Y. 279, 284-85 (1932)). The addition of the phrase that an order to disperse motivated by an intent to discriminate against a viewpoint is not lawful is, as Rusfeldt concedes, "technically not incorrect" and is an example of an order that is "purely arbitrary." Despite the objection of defendants, he was permitted to use his preferred phrase "heckler's veto" in questioning and in argument. (Final Pre-Trial Conference, Tr. 20-22 (ECF 149).)

Rusfeldt also objects to his First Amendment claim being characterized as "retaliation" claim in the jury instructions and his objection was made in a timely manner. (Tr. 312-13.) The use of the term is appropriate and used repeatedly in Nieves and many other cases. 587 U.S at 396-407. Even at that, the claim was described in the instructions without reference to retaliation: "Plaintiff Rusfeldt asserts that his right to free speech under the First Amendment was violated on June 27, 2021, by the conduct of defendant Hughes or another officer of NYPD." (Tr. 376.) In a similar vein, the verdict form asked: "Has Aden Rusfeldt proven by a preponderance of the evidence that the following person or persons, on June 27, 2021, deprived him of a right protected by the First Amendment as defined by the Court?" (ECF 163.) Rusfeldt was not barred from arguing to the jury that basing a decision to issue an order of dispersal on a crowd's reaction to protected speech was a form of viewpoint discrimination.

Rusfeldt's apparent intent in avoiding the use of the word "retaliation" is to avoid the holding of Nieves. The fundamental holding of Nieves is that probable cause defeats a claim of retaliation for protected speech, except for the "narrow qualification" "for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to

- 13 -

do so." Nieves, 587 U.S. at 406.  Police action that is motivated by the crowd's reaction to

Rusfeldt's speech is police action in retaliation for Rusfeldt's speech.

Finally, Rusfeldt's argues that the Court should have instructed the jury that the

officers' threats to arrest him and not merely the ultimate arrest could form the basis for liability,

which he also raised when the Court reviewed the instructions with the parties.  (ECF 166-1 at

24; Tr. 314.)  Under his conception, multiple police warnings in the form of threats of arrests

occurring within minutes of each other that culminate in an arrest are separate claims.  As the

Court previously explained, "the injury which plaintiff alleges flows from the fact of the arrest . .

. ." (Tr. 317.)  The evidence presented at trial is fairly viewed as a single course of conduct.

The Court finds no merit in Rusfeldt's other arguments that he is entitled to a new

trial.

CONCLUSION

For the reasons stated above, plaintiff's motion for a judgment as a matter of law

or, alternatively, for a new trial is DENIED.  The Clerk of Court is directed to terminate the motion.

(ECF 166.)  The Clerk is respectfully requested to enter judgment for defendants Hughes and the

City of New York and close the case.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
      October 2, 2025

- 14 -

**SA46**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
PASTOR ADEN RUSFELDT,

                     Plaintiff,

        -against-                            22 **CIVIL** 594 (PKC)

                                              <u>**JUDGMENT**</u>

CITY OF NEW YORK, NEW YORK;
and STEPHEN HUGHES, in his Individual and
Official Capacity as Assistant Chief of the New
York City Police Department,

                     Defendants.
----------------------------------------------------------------X

       It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion and Order dated October 2, 2025, plaintiff's motion for a judgment

as a matter of law or, alternatively, for a new trial is DENIED. Judgment is entered for

defendants Hughes and the City of New York; accordingly, the case is closed.

**Dated:**  New York, New York

       October 6, 2025

                               **TAMMI M. HELLWIG**
                                _____
                                  **Clerk of Court**

                **BY:**        *K. mango*

                             _____
                                 **Deputy Clerk**

## <u>Constitutional Text</u>

### First Amendment

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

### Fourth Amendment

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

### Fourteenth Amendment § 1

. . . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

## <u>Statutory Text</u>

### NYPL § 240.20(6)

A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [h]e congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse[.]